1   Christopher A. LaVoy, State Bar No. 016609
    RIDENOUR, HIENTON & LEWIS, P.L.L.C.
2   201 North Central Avenue, Suite 3300
    Phoenix, Arizona  85004-1052
3   (602) 254-9900
    Firm E-mail:  designatedcontact@rhlfirm.com
4   Attorney E-mail:  clavoy@rhlfirm.com

5   Carlos Arboleda, State Bar No. 017109
    Arboleda Brechner, PLC
6   4545 East Shea Boulevard, Suite 120
    Phoenix, Arizona 85254
7   (602) 953-2400
    Attorney E-mail: arboledac@abfirm.com

8   Attorneys for Plaintiff and the Class

9

10                      **UNITED STATES DISTRICT COURT**

11                          **DISTRICT OF ARIZONA**

12   Margaret Galas, a single woman,              Case No.
     individually and on behalf of those similarly
13   situated,
                    Plaintiff,
14
              v.
15                                                CLASS ACTION COMPLAINT

16   The Lending Company, Inc., an Arizona
     corporation; Mark A. Nickel and Jennifer
17   Nickel, husband and wife; Dave J. Johnson
     and Lauri Serota-Johnson, husband and
18   wife; RJ Reynolds and Jane Doe Reynolds,
     husband and wife; Family Housing
19   Resources, Inc., an Arizona non-profit
     corporation; Affordable Housing Partners,
20   LLC, an Arizona limited liability company;
     Partners in Action, Inc., an Arizona non-
21   profit corporation; Curtis M. Cluff and
     Susan R. Cluff, husband and wife; Franklin
22   American Mortgage Company, a Tennessee
     corporation; Wells Fargo Funding, Inc., a
23   Minnesota corporation; and John Doe
     Investor Mortgagees,
24
                    Defendants.
25

26

For her Complaint, Plaintiff alleges as follows:

**Overview of Action**

1.  This action—involving another instance of the predatory lending and mortgage fraud that helped hobble the American economy—arises out of The Lending Company, Inc.'s ("TLC") unlawful "down payment assistance" program for mortgage loans insured by the Federal Housing Administration ("FHA").

2.  Federal law requires a 3.5% down payment for an FHA loan. 12 U.S.C. § 1709(b)(9)(A).  No one financially benefiting from the loan (*e.g.*, a seller, lender or real estate agent) may give funds to the borrower to help him come up with the down payment. *Id.*, § 1709(b)(9)(C)(i) & (ii).  However, a charity may financially help the borrower, so long as a financially interested party does not reimburse the charity. *Id.*

3.  Notwithstanding these restrictions, TLC struck deals with several charities to "gift" up to 2.5% of the borrower's down payment, creating what TLC called and heavily marketed as the "1% down" FHA loan.

4.  Unbeknownst to the borrowers and U.S. Department of Housing and Urban Development ("HUD") that administers the FHA loan program, for each loan, TLC paid the charity a behind-the-scenes kickback equal to the amount of the "gift" plus an "administrative fee" as profit.

5.  TLC funded the kickbacks to the charities by hiking the borrower's interest rate to obtain a premium price for the loan in the secondary market.  TLC used such "yield spread" premium to pay the charity.  None of this was disclosed to the borrowers.

6.  The kickback and associated fees amounted to hidden closing costs that TLC did *not* disclose to the borrower or HUD in either its initial GFE ("good faith estimate" of loan closing costs, provided at the loan application stage) or final HUD-1 Settlement Statement (provided shortly before closing, listing the actual closing costs, which ideally should match the GFE) as required by federal law.

7.      To conceal their wrongdoing, for each loan, the charities falsely certified to the borrower and HUD in a "gift letter" that (i) the gift funds were not "made available" to the charity "by any person or entity with an interest in the sale of the property" (which TLC clearly had by virtue of profiting from the sale through origination of the loan for it), and (ii) the borrower "had no repayment obligation of any kind under any circumstances."

8.      Plaintiff, a low-income, first-time minority home buyer who borrowed the purchase money for her Apache Junction home through TLC's "1% down" FHA loan program, brings this action for herself and those similarly situated to recover the amount of TLC's unlawful kickback to the charity that she and the other Class Members have and continue to pay for every month through an inflated mortgage payment. TLC and the charities promised this was a bona fide "gift" that the borrower had no obligation to repay and federal law prohibits any such repayment. By charging Plaintiff and the other Class Members for the "gift" through an inflated interest rate, TLC and the charities defrauded them, violated various consumer protection laws, and breached a material term of the loan agreement.

9.      The other Defendants in this action besides TLC are (i) its principals that conceived of and implemented the "1% down" FHA loan program, (ii) the charities (and the head of one) that knowingly participated in the scheme, (iii) two of the secondary market buyers of the loans that also knowingly participated in it, and (iv) the current holders of the loans for purposes of recoupment and other declaratory and injunctive relief.

## Jurisdiction and Venue

10.      This Court has federal question jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the companion state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d) because this is a putative class action in which the amount in controversy exceeds $5,000,000 and at least one member of the Class is a citizen of a state different from any defendant.

12.     This Court further has jurisdiction over Plaintiff's claim under the Real Estate Settlement Procedures Act pursuant to 12 U.S.C. § 2614.

13.     Last, this Court has jurisdiction over Plaintiff's claim under the Racketeer Influenced and Corrupt Organization Act pursuant to 18 U.S.C. § 1964(a).

14.     Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred within the district.

**The Parties**

15.     Plaintiff Margaret Galas is an unmarried woman and Arizona resident who borrowed the purchase money for her Apache Junction home through TLC's "1% down" FHA loan program.

16.     Defendant TLC is an Arizona corporation engaged in the mortgage banking business.

17.     Defendant Mark A. Nickel is an Arizona resident and the majority owner, CEO and Chairman of TLC who, upon information and belief, conceived of and implemented TLC's "1% down" FHA loan program and is principally responsible for running it on a day-to-day basis.

18.     Defendant Jennifer Nickel is an Arizona resident and Mr. Nickel's wife. She is co-majority owner with her husband of TLC and serves as Secretary for the company.  Upon information and belief, she has actively participated in running TLC's "1% down" FHA loan program since it inception.  She and Mr. Nickel were acting for the benefit of their marital community at all times relevant hereto.

- 4 -

19.     Defendant Dave J. Johnson is an Arizona resident and a minority owner in TLC, as well as its Operations Manager.  Upon information and belief, he has actively participated in running TLC's "1% down" FHA loan program since its inception.

20.     Defendant Lauri Serota-Johnson is Mr. Johnson's wife.  Upon information and belief, Mr. Johnson was acting for the benefit of his marital community at all times relevant hereto.

21.     Defendant RJ Reynolds is an Arizona resident and a minority owner in TLC, as well as its Secondary Manager.  Upon information and belief, he has actively participated in running TLC's "1% down" FHA loan program since its inception.

22.     Defendant Jane Doe Reynolds is, upon information and belief, the wife of Mr. Reynolds if he has one.  If married, upon information and belief, Mr. Reynolds was acting for the benefit of his marital community at all times relevant hereto.  Plaintiff will seek leave to amend the Complaint to include the true name of Jane Doe Reynolds when it is discovered.

23.     Defendant Family Housing Resources, Inc. ("FHR") is an Arizona non-profit corporation that was one of the charities that partnered with TLC in its "1% down" FHA loan program.

24.     Defendant Affordable Housing Partners, LLC ("AHP") is an Arizona limited liability company that was the other charity that partnered with TLC in its "1% down" FHA loan program.

25.     Defendant Partners in Action, Inc. ("PA") is an Arizona non-profit corporation.  It is the sole member of AHP (*i.e.*, AHP is a wholly-owned subsidiary of PA).  Upon information and belief, PA exercised complete dominion and control over AHP at all times relevant hereto, managing and directing AHP's business affairs, and using AHP as an instrumentality to engage in the unlawful conduct described herein, rendering AHP the alter ego of PA at all times relevant hereto.  Under these

- 5 -

circumstances, PA and AHP's status as legally separate entities should be disregarded and they should be treated as one and the same for liability purposes.  Recognizing the fiction of these entities' legal separateness would perpetuate a fraud on Plaintiff and the other Class Members.

26.     Defendant Curtis M. Cluff is an Arizona resident and the President and Chairman of PA and, upon information and belief, the person who made the decision for AHP through PA to partner with TLC in its "1% down" FHA loan program and who was primarily responsible for managing AHP and PA's business relationship with TLC, primarily dealing with Mr. Nickel.

27.     Defendant Susan R. Cluff is Mr. Cluff's wife.  Upon information and belief, Mr. Cluff was acting for the benefit of his marital community at all times relevant hereto.

28.     Defendant Franklin American Mortgage Company ("FAMC") is, upon information and belief, a Tennessee corporation conducting business in Arizona at all times relevant hereto.

29.     Defendant Wells Fargo Funding, Inc. ("Wells Fargo") is, upon information and belief, a Minnesota corporation conducting business in Arizona at all times relevant hereto.

30.     Defendant John Doe Investor Mortgagees are those persons and/or entities whose names are unknown to Plaintiff and who acquired and currently hold either legal or beneficial title in one more TLC "1% down" FHA loans.  If FAMC, Wells Fargo or any other named Defendant currently holds such a loan, this designation applies to them as well and they are subject to the claims asserted herein against John Doe Investor Mortgagees.  Plaintiff will seek leave to amend the Complaint to include the true names of John Doe Investor Mortgagees when they are discovered.

31.     Defendants Mark A. Nickel, Dave J. Johnson and RJ Reynolds, with their spouses, are collectively referred to herein as the "TLC Executives" and, with Curtis M. Cluff and his spouse, the "Executives."

32.     FHR, AHP and PA are collectively referred to herein as the "Charities."

**Factual Background**

**A.     FHA Loans**

33.     The FHA was established in 1934 at the height of the Great Depression, when rates of foreclosures and defaults rose sharply.  It provides insurance for mortgage loans made by FHA-approved lenders throughout the United States and its territories.  It became a part of HUD in 1965.

34.     In the event of a borrower default on an FHA loan, the lender or other party holding the note submits a claim to HUD for the costs associated with the defaulted mortgage and the sale of the property.  HUD then pays off the balance of the mortgage and other related costs, and may assume ownership of the property.

35.     FHA loans are, in essence, a type of federal assistance and have historically allowed lower income Americans to borrow money for the purchase of a home that they would not otherwise be able to afford.  As noted in a recent NEW YORK TIMES article, FHA loans are, for the most part, "the only game in town for first-time buyers of modest means."[1]

36.     The FHA loan program is the largest insurer of mortgages in the world, insuring over 34 million properties since its inception.  As noted in the same NEW YORK TIMES article, FHA loans "represented almost a third of all mortgages in 2011, and as many as 47 percent in the second quarter of 2010."

---

[1] Vickie Elmer, "Changes in F.H.A. Fees," NEW YORK TIMES (online ed.), March 22, 2012, accessed May 31, 2012, http://www.nytimes.com/2012/03/25/realestate/mortgages-changes-in-federal-housing-administration-fees.html

37.    In the mortgage industry, FHA loans are highly marketable for securitization and/or resale to investors both because such loans are expected to have met HUD requirements and because they are backed by the full faith and credit of the United States.

**B.     The History of FHA Loan "Down Payment Assistance"**

38.    Because FHA borrowers are typically lower income, they often have difficulty coming up with the required 3.5% down payment.

39.    Over the years, those standing to profit from the making of FHA loans— *e.g.,* sellers, real estate agents and lenders—have devised various strategies to help the borrower raise the 3.5% down payment.

40.    The original strategy was for the seller to directly give the borrower the down payment, but that was banned.

41.    A clever workaround then developed, which involved a non-profit gifting the down payment to the borrower, with the seller then making a donation to the non-profit after closing that was equal to the "gift" plus an administrative or processing fee, which served as the charity's profit.  The theory and argument was that the seller's post-closing donation to the charity did not fund *that* buyer's down payment, but rather a *future* buyer's down payment for *another* purchase by replenishing the charity's pool of funds.

42.    Threading a regulatory loophole that HUD surprisingly did not quickly close, this charitable conduit strategy gained increasing acceptance and legitimacy, to the point that established national lenders began using it.

43.    A cottage industry developed around this subterfuge, with the emergence of large, national companies masquerading as charities to profit from it, replacing the mostly local charities that previously served as the down payment conduit.  The most prominent example of such a company was Nehemiah Corporation of America ("Nehemiah"); the

name was a religious reference to the Book of Nehemiah in the Hebrew Bible, chosen to bolster its purported charitable character.

44.     As this practice expanded, HUD increasingly grew uncomfortable with it and, after stalemate litigation with Nehemiah over whether it was violating existing regulations, HUD proposed a rule change in 1999 that would have effectively outlawed the practice, but it then withdrew the proposed rule when confronted with well-funded industry opposition. *See* Withdrawal of Proposed Rule on Sources of Homeowner Downpayment, 66 Fed. Reg. 2,851, 2,852 (Jan. 12, 2001).

45.     Then, in 2005, the Government Accountability Office issued a report expressing concerns that seller-funded down payment assistance resulted in higher home prices without comparable increases in buyer equity (finding a 3% increase, on average, as compared to comparable homes without such assistance).  It further found this practice was associated with greater delinquency and default rates: 22-28% delinquency for loans with this type of assistance, as compared to 11-16% for other types of down payment assistance (*e.g.*, a gift from a relative) and 8-12% for loans without any type of down payment assistance.  The report concluded by recommending that HUD "revise [] standards to treat assistance from a seller-funded nonprofit as a seller contribution." G.A.O. A.R. 00549-50.

46.     In 2006, highlighting their sham nature, the Internal Revenue Service issued a ruling effectively revoking such charities' 501(c)(3) status. *See* I.R.S. Rev. Rul. 2006-27.  It explained in an accompanying press release:

> So-called charities that manipulate the system do more than mislead honest homebuyers and ultimately jack up the cost of the home.  They also damage the image of honest, legitimate charities.

I.R.S. News Release IR-2006-74 (May 4, 2006).

47.     Under increasing pressure, in 2007, HUD finally passed an administrative rule change outlawing the practice. *See* Standards for Mortgagor's Investment in Mortgaged Property, 72 Fed. Reg. 27,048 (May 11, 2007); Standards for Mortgagor's Investment in Mortgaged Property: Extension of Public Comment Period, 72 Fed. Reg. 37500-01 (July 10, 2007); Standards for Mortgagor's Investment in Mortgaged Property, 72 Fed. Reg. 56002-01 (October 1, 2007).

48.     The industry responded with an onslaught of lawsuits challenging the new administrative prohibition (*see, e.g., Nehemiah Corp. of Am. v. Jackson*, 546 F. Supp. 2d 830 (E.D. Cal. 2008) and *Penobscot Indian Nation v. U.S. Dept. of Hous. & Urban Dev.*, 539 F. Supp. 2d 40 (D.D.C. 2008)), which was then mooted by Congress statutorily prohibiting the practice, with the following amended language in 12 U.S.C. § 1709:

> **Prohibited sources**
>
> In no case shall the funds required by subparagraph (A) consist, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale:
>
> > (i) The seller or any other person or entity that financially benefits from the transaction.
> >
> > (ii) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in clause (i).
>
> This subparagraph shall apply only to mortgages for which the mortgagee has issued credit approval for the borrower on or after October 1, 2008.

Housing and Economic Recovery Act of 2008, Pub. L. No. 110–289, 122 Stat. 2654 (2008).

## C.     HUD's Charitable Gift Rules Since the 2008 Law Change

49.     Consistent with 12 U.S.C. § 1709, HUD rules provide that, "In order for funds to be considered a gift, there must be no expected or implied repayment of the funds to the donor by the borrower." HUD Handbook, 4155.1, at 5.B.4.a.

50.     A gift from a "charitable organization" is allowed so long as it meets the foregoing requirement. *Id.*, at 5.B.4.b.

51.     The charity must qualify as a "charitable organization as defined by Section 501(a) of the Internal Revenue Code (IRC) of 1986 pursuant to Section 501(c)(3) of the IRC." *Id.*, at 5.B.4.j.

52.     The charity "may not be a person or entity with an interest in the sale of the property" because then the gift is "considered [an] inducement to purchase, and must be subtracted from the sales price." *Id.*, at 5.B.4.c.

53.     The lender "must ensure that a gift provided by a charitable organization meets the appropriate FHA requirements, and that the transfer of funds is properly documented." *Id.*, at 5.B.4.h.

54.     HUD requires the lender to "document any gift funds through a gift letter, signed by the donor and borrower" and the "gift letter must . . . state . . . that no repayment is required." *Id.*, at 5.B.5.a.

**D.      TLC the Company**

55.     TLC is an Arizona corporation formed in 1995.

56.     Upon information and belief, Mark and Jennifer Nickel currently hold a majority 80% stake in TLC, with Mr. Nickel serving as CEO and Chairman of TLC and Mrs. Nickel as Secretary.

57.     Upon information and belief, the minority owners are Dave Johnson and RJ Reynolds, each holding a 10% interest in TLC with their wives.

58.     Mr. Johnson serves as Operations Manager at TLC, while Mr. Reynolds serves as the Secondary Manager overseeing the sale of loans in the secondary market.

59.     TLC has been engaged in the mortgage banking business since its formation and is licensed as a mortgage bank by the Arizona Department of Financial Institutions.

60.     In their traditional forms, a mortgage bank is different than a mortgage broker in that it actually funds the loans it originates, whereas a mortgage broker originates loans on behalf of third-party lenders that fund them.

61.     Like most mortgage banks, TLC funds its loan by drawing down on a short-term revolving line of credit from another lender, known in the mortgage banking industry as a "warehouse line" from a "warehouse lender."  TLC replenishes the line of credit with the proceeds from the sale of the loans it originates in the secondary market. The secondary market buyer of a loan is often referred to as a "takeout investor."

62.     TLC's sale of a loan to a secondary market buyer was normally pursuant to a pre-existing "correspondent lending" contract with the buyer, which typically required TLC to repurchase the loan if it was found to have any defects, such as evidence of fraud or non-compliance with HUD underwriting standards.  Upon information and belief, TLC had "correspondent lending" contracts with *inter alia* GMAC Bank, FAMC and Wells Fargo.

63.     In practice, TLC's warehouse lender did not wire the funds to TLC, but rather directly into the escrow account at closing.  Further, TLC's warehouse lender would not do this until TLC had obtained a preliminary commitment from a secondary market buyer to purchase the loan after closing.

64.     Thus, TLC never actually received and held the funds that it borrowed from the warehouse lender and the warehouse lender was normally repaid shortly after closing from the proceeds of the secondary market purchase of the loan.  The secondary market buyer would normally wire the purchase funds directly into the warehouse lender's account, at which point the warehouse lender and TLC would reconcile.

65.     TLC normally endorsed the borrower's promissory note "in blank" at closing, effectively rendering it a bearer instrument.  The escrow agent would then deliver the endorsed note to the warehouse lender to hold as security for TLC's repayment of the

credit line advance.  The warehouse lender then in turn sent the endorsed note to the secondary market buyer with a "bailee letter" protecting the warehouse lender's rights in the promissory note pending the secondary market buyer's payment for it.  After the secondary market buyer paid for the loan, the "bailee letter" would become inoperative and the note would then belong to the buyer.

**E.     TLC's Role as a Direct Endorsement Lender**

66.     TLC is a direct-endorsement lender, which means that HUD delegates it the authority to underwrite and endorse loans for FHA insurance without prior HUD review or approval.

67.     TLC acts as an agent and fiduciary of HUD in its direct endorsement role. TLC is obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in its dealings with HUD and borrowers.  This duty requires TLC to make full and fair disclosures to HUD and borrowers of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading them.

68.     TLC is responsible for all aspects of the application, property analysis, and underwriting of the loan, which means "evaluat[ing] [each] mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).

69.     After each loan closing, TLC was required to certify to HUD as to that loan that it conducted due diligence and/or ensured data integrity and that the endorsed loan complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." HUD Form 92900-A.

70.     To maintain its direct endorsement status, TLC was required to implement and maintain a quality control program.  As part of that program, where there were

"[f]indings of fraud or other serious violations," TLC was required to immediately notify HUD. HUD Handbook, 4060.1 REV-2, at 7.3.j.

71.     TLC was also required to certify annually to HUD that it was generally complying with all applicable procedures and requirements.

**F.     TLC's "1% Down" FHA Loan Program with FHR**

72.     Upon information and belief, sometime not long after the 2008 law change, TLC conceived of and implemented its "1% down" FHA loan program.

73.     TLC viewed the law change as an opportunity to gain a strategic advantage in the marketplace by continuing to offer down payment assistance, albeit lender rather than seller funded, while its competitors were discontinuing their seller-funded down payment assistance programs (without a substitute) to comply with the law change.  Such "gift" would not only draw FHA borrowers away from competitors, but also provide a bait-and-switch tool, whereby it could steer prospective borrowers inquiring about the program into other more profitable loan products.

74.     Essential to the program was finding an unscrupulous "charity" willing to partner with TLC.  The first one TLC found and partnered with was FHR, based out of Tucson, Arizona.  FHR agreed to provide the "gift" in exchange for TLC reimbursing FHR and paying it a percentage per-gift "administrative fee," which represented FHR's profit.

75.     This agreement is reflected in the spreadsheet attached as Exhibit 1.   Upon information and belief, TLC prepared and emailed this spreadsheet to FHR in or about September 2009, which was after TLC and FHR had already begun working together.

76.     The spreadsheet forecasted FHR's anticipated revenues and profits from the gift program over the next twelve-month period based on an "average loan" amount of "just over $145,000.00" (line 46).  It states FHR is being reimbursed the amount of the "Gift" plus ".45" percent as an "Admin Fee" (lines 17 and 18, column B).  For a $3,900

gift FHR would be reimbursed $4,316 with a profit of $416 (lines 13 and 17, column B). It projected $312,844 in profits for FHR over the next twelve months (line 22, column N).

77.     As reflected in the spreadsheet, TLC also paid itself a "Product Manager Fee" of ".10" percent (line 25, column A) that it projected would yield TLC $109,044.28 in profits over the next twelve months (line 26, column N).

78.     According to the spreadsheet, TLC and FHR had already done 77 such loans at the time TLC prepared the spreadsheet (line 35, column B).

79.     Further evidencing TLC's reimbursement to FHR, attached as Exhibit 2 is, upon information and belief, a copy of FHR's December 2009 reimbursement "invoice" that it mailed to TLC, requesting payment of the "Gift Amount" and "Fees" for the period, with a total due of $32,163.88.

80.     As more evidence, attached as Exhibit 3 is, upon information and belief, a copy of a TLC interest rate "lock" statement (except for redaction of the borrower's name and other personal information), which specifically lists and factors in the cost of TLC's reimbursement to FHR as an expense (see bottom right corner of document) in calculating the loan officer's commission.

81.     Upon information and belief, for each such loan, FHR mailed and/or emailed a "gift letter" to TLC and the borrower shortly before closing.  Such letter falsely represented and certified that (i) the gift funds were not "made available" to FHR "by any person or entity with an interest in the sale of the property," and (ii) the borrower "had no repayment obligation of any kind under any circumstances."  Upon information and belief, FHR understood that TLC would mail and/or electronically file a copy of the letter with HUD as verification that the loan qualified for FHA insurance.

82.     Such statements in the "gift letter" were false.  The borrower did in fact have a "repayment obligation[]" because TLC increased the interest rate (according to a set formula in the computer program used by the loan officer) to cover the expense of

reimbursing FHR and paying the associated fees.  The interest rate increase was *not* risk based.  Had the FHA borrower obtained a 2.5% down payment gift from a relative, rather than through TLC's partnering charity, TLC would *not* have charged the borrower the same higher interest rate as for a charity gift loan on the theory that both had an increased default risk as a result of the borrower having less "skin in the game," but rather would have classified and priced it the same as a non-gift FHA loan.  This is made clear by the fact that TLC priced gift and non-gift FHA loans the same to secondary market buyers, specifically acknowledging to them that the gift and non-gift FHA loans they originated had the same risk profile.

83.    The "gift letter" was also false because the gift funds were "made available" to FHR by someone "with an interest in the sale of the property," specifically TLC who profited from the sale by originating the loan for it.

84.    Upon information and belief, for each loan, at or about the time of closing, TLC also falsely represented and certified, in its Direct Endorsement Approval for a HUD/FHA-Insured Mortgage mailed to and/or electronically filed with HUD, that (i) "this mortgage is eligible for HUD mortgage insurance," (ii) "[no] charge has been made to or paid by the borrower except as permitted under HUD regulations," and (iii) TLC "has not paid any kickbacks, fee or consideration of any type, directly or indirectly, to any party in connection with this transaction except as permitted under HUD regulations and administrative instructions." HUD-92900-A form.

85.    Upon information and belief, TLC also annually falsely certified electronically (*i.e.,* by wire) through HUD's FHA Connection, an on-line access system to HUD's computer system, that it "conforms to all HUD regulations" and has "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title 1 Letters, policies, and terms of any agreements entered into with the Department."

86.     Upon information and belief, FHR also mailed and/or emailed TLC a receipt for its reimbursement of the "gift" falsely characterizing it as a charitable donation or alternatively as payment for a lawful services, which TLC, upon information and belief, then used for the purpose of taking a tax deduction.

87.     Upon information and belief, not long after TLC began its "1% down" FHA loan program, one or more competitors made inquiries or complaints to HUD regarding the legality of the program, triggering a HUD audit.  Upon information and belief, HUD informed TLC that its reimbursement to FHR violated federal law and instructed TLC to discontinue the practice.  Upon information and belief, TLC assured HUD that it had discontinued such reimbursements and would not resume the practice in the future.

88.     However, upon information and belief, TLC lied to HUD and continued to make the reimbursements to FHR during and after the audit.  The only change TLC made going forward was to more effectively conceal the reimbursements from HUD and others.  For example, TLC eliminated the line item expense for reimbursing the charity on its interest rate "lock" statements and re-characterized it as a "Risk Based Adjuster" (*see* Exhibit 4).  That was untrue, as TLC admitted to its secondary market buyers.  It told them that the FHA "gift" loans it originated presented no greater risk of default than otherwise comparable non-gift ones.  To further conceal the reimbursements, TLC later removed the "Risk Based Adjuster" reference also, thereby avoiding any explicit reference whatsoever to the charge.

89.     Upon information and belief, at some point, a TLC competitor attempted to establish a similar program with FHR and to sell the loans to GMAC Bank, which was already purchasing such loans from TLC, albeit without knowledge of TLC's reimbursement to the charity.  FHR provided a copy of its contract with TLC to GMAC Bank as part of the competitor's proposal to it.  Upon reviewing the contract and discovering TLC's reimbursement to FHR provided for therein, GMAC Bank declined

the competitor's proposal and ceased purchasing such loans from TLC.  GMAC bank

stated the following in its "Notice of Declination" letter to TLC (*see* Exhibit 5):

> **Reason of Ineligibility**:  Based on new information submitted to GMAC
> the approval for this program has been withdrawn effective 10/04/2010.
> The funds for the program, given by the Family Housing Resources, Inc.
> through their Arizona Homebuyers Solutions Gift Program, are ultimately
> paid by the lender.  The Lender is required to pay a Service Fees [sic] that
> equals the amount of the Grant (2.5%) plus a processing/underwriting fee
> (.45%).  This is not an allowable source of funds.

90.     As the GMAC Bank letter demonstrates, as well as the HUD audit and TLC

deleting any reference to the reimbursement in the "lock" statements, the TLC Executives

were acutely aware of the illegality of the reimbursements.  Such awareness is further

evidenced by an April 1, 2011 email between them (*see* Exhibit 6), wherein Mr.

Reynolds, in response to a HUD alert about the down payment assistance rules, stated to

Messrs. Nickel and Johnson:

> Technically we fall into the "or any party that financially benefits from the
> transactions[.]"

> Maybe we should consider getting rid of the gift program after all and focus
> just on the 2nd lien program.

However, TLC did not discontinue the program.

**G.     FAMC's Role in the Program**

91.     Upon information and belief, about this same time, a TLC employee

familiar with TLC's "1% down" FHA loan program, whose name is unknown to Plaintiff,

sent an anonymous "whistleblower" letter to various parties having an interest in the

loans, including secondary market buyers FAMC and Wells Fargo.  Upon information

and belief, the letter disclosed TLC's reimbursements to the charity and the unlawful

nature of such reimbursements.

92.     Upon information and belief, shortly thereafter, FAMC's local purchasing

representative visited Mr. Nickel and provided him with a copy of the letter.  The FAMC

representative told Mr. Nickel that TLC had a "problem employee" and "needed to deal with it," or words to that effect, in an effort to preserve the program for TLC and FAMC's mutual benefit.

93.     Upon information and belief, the FAMC representative recognized, as a matter of common sense, that TLC must have been reimbursing the charity, as alleged in the letter, because the charity, which had no apparent source of income, would have run out of money otherwise given the volume of such loans.

94.     Also, the interest rate never corresponded to the borrower's credit score for these loans, which was an obvious red flag for FAMC that the interest rate was being increased to cover some hidden cost.

95.     Upon information and belief, the FAMC representative further recognized, as a matter of common sense, that such program must be unlawful, as alleged in the letter, given that no other mortgage banks were engaging in it.

96.     Upon information and belief, FAMC did not forward a copy of the letter or relate its allegations to HUD or any other regulatory or law enforcement official and took no action to meaningfully investigate the allegations, but rather consciously decided to bury the letter and information contained therein to protect the program and the program loans that FAMC held.

97.     Upon information and belief, FAMC and TLC reached a tacit understanding at that point, with full knowledge of the unlawful nature of the program, that TLC would continue to originate the loans and FAMC to buy them, that neither would disclose the fact of TLC's reimbursement to the borrower or HUD, that each would continuing making false representations and certifications to HUD regarding them, and that they would both otherwise continue to act and operate as if such reimbursements were not being made.

98.     Upon information and belief, FAMC knew about and intended to facilitate and support this scheme by continuing to purchase the loans and assisting TLC in concealing it, all with the common purpose of maintaining, expanding and mutually profiting from the program.

99.     Upon information and belief, since receiving this letter, FAMC has annually falsely certified electronically (*i.e.,* by wire) through HUD's FHA Connection, an on-line access system to HUD's computer system, that it "conforms to all HUD regulations" and has "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title 1 Letters, policies, and terms of any agreements entered into with the Department."

**H.     Wells Fargo's Role in the Program**

100.     Upon information and belief, Wells Fargo also received a copy of the TLC employee's "whistleblower" letter in mid to late 2010.

101.     Upon information and belief, Wells Fargo recognized, as a matter of common sense, that TLC must have been reimbursing the charity, as alleged in the letter, because the charity, which had no apparent source of income, would have run out of money otherwise given the volume of such loans.

102.     Upon information and belief, Wells Fargo further recognized, as a matter of common sense, that such program must be unlawful, as alleged in the letter, given that no other mortgage banks were engaging in it.

103.     Also, the interest rate never corresponded to the borrower's credit score for these loans, which was an obvious red flag for Wells Fargo that the interest rate was being increased to cover some hidden cost.

104.     Upon information and belief, Wells Fargo did not forward a copy of the letter or relate its allegations to HUD or any other regulatory or law enforcement official and took no action to meaningfully investigate the allegations, but rather consciously

decided to bury the letter and information contained therein to protect the program and the program loans that Wells Fargo held.

105.    Upon information and belief, the only action Wells Fargo took in response to the letter was to discontinue buying the loans *directly* from TLC, but instead start buying them from FAMC, which, as noted above, continued to buy them from TLC after receiving the letter.  Upon information and belief, Wells Fargo perceived this to be a safe *indirect* means of acquiring and profiting from the loans.  Upon information and belief, Wells Fargo continued to buy non-gift loans from TLC after receiving the letter.

106.    Upon information and belief, after Wells Fargo's receipt of the letter, it reached a tacit understanding with TLC and FAMC, with full knowledge of the unlawful nature of the program, that TLC would continue to originate the loans and Wells Fargo would to buy them from FAMC, that none of them would disclose the fact of TLC's reimbursement to the borrower or HUD, that each would continuing making false representations and certifications to HUD regarding them, and that they would all otherwise continue to act and operate as if such reimbursements were not being made.

107.    Upon information and belief, Wells Fargo knew about and intended to facilitate and support this scheme by continuing to purchase the loans indirectly through FAMC, as well as to assist TLC and FAMC in concealing the reimbursements from HUD, all with the common purpose of maintaining, expanding and mutually profiting from the program.

108.    Upon information and belief, since receiving this letter, Wells Fargo has annually falsely certified electronically (*i.e.,* by wire) through HUD's FHA Connection, an on-line access system to HUD's computer system, that it "conforms to all HUD regulations" and has "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title 1 Letters, policies, and terms of any agreements entered into with the Department."

**I.     AHP's Role in the Program**

109.    Upon information and belief, sometime in mid to late 2010, TLC switched from FHR to AHP as its partnering charity.  Upon information and belief, its agreement with AHP was the same as that with FHR, except that the administrative fee it paid AHP was slightly lower than what it had paid FHR, which was part of its reason for switching.

110.    Upon information and belief, TLC reimbursed AHP by making a donation to PA, FHR's parent charity, in an attempt to conceal the reimbursement, with PA then funneling most of it back to AHP to fund further gifts.

111.     Upon information and belief, at or about the time of closing for a loan, AHP mailed and/or emailed a "gift letter" to TLC and the borrower making the same false representations and certifications as FHR did in its letter.  Upon information and belief, AHP understood that TLC would mail and/or electronically file a copy of the letter with HUD as verification that the loan qualified for FHA insurance.

112.    Upon information and belief, at or about the time of the reimbursement, PA mailed and/or emailed a receipt to TLC similar to the one that FHR had given it.

113.    Upon information and belief, Messrs. Nickel and Cluff were primarily responsible for structuring and managing the business relationship between TLC and AHP and PA.

**J.     The Recent Cessation of the Program**

114.    Sometime in the spring of 2012, another TLC employee familiar with the program, after being fired by Mr. Nickel for questioning the program, sent a "whistleblower" letter (*see* Exhibit 7) to various parties having an interest in the loans, including TLC's warehouse lender.

115.    Upon information and belief, the warehouse lender discontinued funding such loans in response to the letter, thereby effectively ending the program.

116.    TLC's website lists the program as "currently unavailable" while it attempts to locate another warehouse lender for the program.

117.    In response to the former employee's letter, TLC retaliated by suing him for defamation (*see* Exhibit 8), asserting that he "falsely informed third parties that TLC is violation of the 2008 HERA act, Section 2113(c)."  The Housing and Economic Recovery Act of 2008 is the federal legislation that finally banned such down payment assistance. Mr. Nickel verified the allegations in the complaint "under the penalty of perjury."

**K.    Plaintiff's Loan**

118.    In or about May 2010, Plaintiff applied for and obtained a "1% down" FHA loan for $132,554 from TLC to purchase her first home.  A true and correct copy of her promissory note is attached as Exhibit 9 hereto.

119.    Plaintiff is a single woman who works as cook.  As reflected in her loan application (*see* Exhibit 10), her annual income at the time was less than $35,000.

120.    FHR made a "gift" of $3,375 to Plaintiff, as reflected in its "gift letter" to her (*see* Exhibit 11).

121.    As with the other loans, TLC reimbursed FHR for the "gift."

122.    Further, TLC charged plaintiff two administrative fees, one for FHR and the other for TLC as profit for them, both of which were undisclosed.  As with the "gift," Plaintiff pays for these fees through her increased interest rate.

123.    As with the other loans, TLC falsely certified to HUD (*see* Exhibit 12) that (i) "this mortgage is eligible for HUD mortgage insurance," (ii) "[no] charge has been made to or paid by the borrower except as permitted under HUD regulations," and (iii) TLC "has not paid any kickbacks, fee or consideration of any type, directly or indirectly, to any party in connection with this transaction except as permitted under HUD regulations and administrative instructions."

124.   TLC's payments to FHR and itself for this gift/reimbursement settlement service were not disclosed on either Plaintiff's GFE or HUD-1 Settlement Statement.  Nor did TLC or FHR otherwise disclose such payments to Plaintiff or that she was in fact being charged for the "gift" and obligated to repay it through the interest rate hike.  Had Plaintiff known any of this, she would not (and could not) have accepted the loan because to do so would have violated federal law.

### Common Course of Conduct Emanating from Arizona

125.   Upon information and belief, the unlawful course of conduct outlined above was created, adopted, ratified and/or implemented in the corporate headquarters of TLC and the Charities, all located in Arizona.  Upon information and belief, the responsible Executives at these companies also reside in Arizona and a substantial part, if not all, of the alleged misconduct took place in Arizona.  Therefore, application of Arizona law to a nationwide class is appropriate.

### John Doe Investor Mortgagees Do Not Qualify as "Holders in Due Course"

126.   John Doe Investor Mortgagees do not qualify as "holder[s] in due course" under A.R.S. § 47-3302.

127.   First, the form of promissory note that TLC used for Plaintiff and the other Class Members' loans (Exhibit 9) does not qualify as an "instrument" as that term is used in A.R.S. § 47-3302(A) and defined by A.R.S. §§ 47-3103(B)(17) and 47-3104(A).

128.   To qualify as an "instrument," the promissory note must constitute an "unconditional promise . . . to pay" as that phrase is used in A.R.S. § 47-3104(A) and defined in A.R.S. § 47-3106.

129.   However, TLC's promissory note does not so qualify because the language in paragraph 4.C effectively provides that rights and obligations with respect to the borrower's promise to pay are included in the separate Security Instrument, and that the borrower's promise to pay is effectively subject to and governed by that separate writing,

which goes beyond merely referencing rights with respect to collateral covered by the Security Instrument. *See* A.R.S. § 47-3106(A)(3) & (B)(1).

130.   TLC's promissory note also does not qualify as an "instrument" because paragraph 4.D states that the borrower's promise to pay is subject to "adjustment[]" under a possible separate allonge, which paragraph 4.D incorporates by reference.  This reference to and incorporation of a possible separate writing makes the borrower's obligation to pay and the amount thereof subject to and governed by that document. *Id.* Thus, the holder of the promissory note cannot be sure how much is owed, how it is to be paid, and when, which defeats the promissory note's status as an "instrument." *Id.*

131.   The second reason that at least some of John Doe Investor Mortgagees, such as FAMC and Wells Fargo (to the extent they still hold any of these loans), do not qualify as a "holder[s] in due course" is because, upon information and belief, they did not take the "instrument" (assuming *arguendo* it so qualifies) in "good faith" and "[w]ithout notice that any party has a defense or claim in recoupment." A.R.S. §§ 47-3302(A)(2)(b) & (A)(2)(f).

132.   Last, even if John Doe Investor Mortgagees do qualify as "holder[s] in due course," they are still subject to the defense of "illegality." A.R.S. §§ 47-3302(A)(1)(b). Upon information and belief, the procurement of the subject loans was illegal, rendering the promissory notes and accompanying deeds of trust void and unenforceable.

### Equitable Tolling and/or Equitable Estoppel

133.   To the extent any of the causes of action alleged below are untimely as to Plaintiff (who only discovered the true nature of TLC's "1% down" FHA loan program within the last few months) or any Class Member based on the running of any applicable period of limitations prior to the filing of this action, the time-extending doctrines of equitable tolling and/or equitable estoppel (sometimes referred to as fraudulent concealment) are applicable based on Defendants not disclosing, actively concealing, and

affirmatively misrepresenting the true nature of the program to Plaintiff and the other Class Members at the time of originating the loans and in the course of servicing them.

**Class Action Allegations**

134.    Plaintiff sues on her own behalf and on behalf of a class of persons pursuant to Fed. R. Civ. P. 23 (the "Class").

*Class Definition*

135.    The Class consists of all persons in the United States who applied for and received an FHA loan through TLC's "1% down" FHA loan program from the start of the program to present (the "Class," "Class Member(s)" and "Class Loans"). Excluded from the Class are Defendants and their employees, officers, directors, agents, legal representatives, heirs, and successors.

*Numerosity*

136.    The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the Class is estimated to include between 500 and 1,200 persons. The exact size of the Class will be easily ascertainable from Defendants' records. The names and addresses of the Class Members will also be easily ascertainable from such records.

*Typicality*

137.    Plaintiff's claims are typical of the Class Members' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendants with respect to the Class as a whole.

*Commonality*

138.    There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

(a)     Whether TLC directly or indirectly reimbursed the Charities;

(b)     Whether TLC and the Charities charged any fees in connection with the gift/reimbursement transaction;

(c)     Whether TLC and the Charities' standardized documents for the transaction disclosed the reimbursement and associated fees, as well as the corresponding interest rate increase, to the borrower;

(d)     Whether such gift/reimbursement transaction was lawful;

(e)     Whether such gift/reimbursement transaction violated the Real Estate Settlement Practices Act;

(f)     Whether Defendants made false representations and certifications to HUD;

(g)     Whether TLC and the Charities' standardized documents for the gift/reimbursement transaction included misrepresentations and omissions;

(h)     Whether a reasonable person would have relied on such misrepresentations;

(i)     Whether the program constituted a scheme and artifice to defraud;

(j)     Whether some or all of Defendants were engaged in a conspiracy to carry out such scheme and artifice to defraud;

(k)     Whether Defendants engaged in the pattern of predicate acts alleged herein;

(l)     Whether Defendants violated the Racketeer Influenced and Corrupt Organization Act;

(m)     Whether Defendants violated the Arizona Consumer Fraud Act;

(n) Whether the John Doe Investor Mortgagees qualify as holders in due course or are otherwise subject to borrowers' claims and defenses arising out of the loans;

(o) Whether TLC breached the loan agreement by charging borrowers for the reimbursement and associated fees; and

(p) Whether the time-extending doctrines of equitable tolling and/or equitable estoppel applies to any claims that are otherwise time-barred.

*Adequacy*

139. Plaintiff will fairly and adequately protect the interests of the Class.

140. Plaintiff has retained class action counsel able and experienced in the field.

*Predominance*

141. To the extent there are any individual questions, common questions of law and fact predominate over them.

*Superiority*

142. Resolution of this action on a class-wide basis is superior to other available methods of adjudication and is a fair and efficient means of adjudicating the controversy because in the context of this litigation no individual Class Member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendants.

143. It is also superior because adjudication of the borrowers' claims on a classwide basis would save judicial resources and otherwise be more efficient as compared to a multiplicity of individual suits.

. . .

. . .

. . .

144.    Separate actions by individual Class Members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of Class Members to pursue their claims.

## Jury Trial Demanded

145.    Plaintiff hereby demands a jury trial an all issues so triable.

## Causes of Action

### First Cause of Action
### Violation of Real Estate Settlement Procedures Act—"Business Referral"
### (12 U.S.C. § 2607(a))
### (Against TLC, the Charities, the Executives, and John Doe Investor Mortgagees)

146.    The preceding allegations are hereby incorporated by reference as if fully set forth herein.

147.    Each of the Class Loans constituted a "federally related mortgage loan." 12 U.S.C. § 2602(1).

148.    The Charities' "gifts" to TLC's borrowers and TLC's reimbursement thereof constituted "settlement services." 12 U.S.C. § 2602(3); *see also* 24 C.F.R. § 3500.2.

149.    These gift/reimbursement settlement services constituted "business incident" to a "real estate settlement service," given that TLC and the Charities profited therefrom. 12 U.S.C. § 2607(a).

150.    TLC "referred" the gifting work to the Charities by requiring its borrowers to use the particular charity that TLC was partnering with at the time. 12 U.S.C. § 2607(a); *see also* 24 C.F.R. § 3500.14(f),

151.    Such referral was "pursuant to" an "agreement or understanding" with the Charities; it was TLC's pattern, practice and course of conduct to refer this gifting business to the Charities. 12 U.S.C. § 2607(a); *see also* 24 C.F.R. § 3500.14(d).

152.    For each such referral, the following "fee[s]" and "thing[s] of value" were "give[n]" and "accept[ed]" (12 U.S.C. § 2607(a); *see also* 24 C.F.R. § 3500.14(d)):

    (a)    TLC gave and the Charities accepted an unlawful reimbursement of the "gift," which included a percentage profit for the Charities based on the size of the loan;

    (b)    The Charities gave and TLC accepted the "gift letter" falsely certifying the borrower had no obligation to repay the "gift" and that no one with a financial interest in the transaction was reimbursing the charity for it, which had value because TLC could not make and profit from the loan without it; and

    (c)    The Charities gave and TLC accepted a fraudulent receipt for the reimbursement that falsely characterized it as a charitable donation or alternatively as payment for a lawful service by TLC, which had value because TLC needed a receipt to take a tax deduction.

153.    Such "fees" and "thing[s] of value" were not payment of "bona fide salary or compensation" (12 U.S.C. § 2607(c)(2); *see also* 24 C.F.R. § 3500.14(g)) because they were unlawful, made in bad faith, and with an intent to defraud and deceive Plaintiff and the other Class Members, as well as HUD.

154.    As a result, TLC and the Charities violated 12 U.S.C. § 2607(a) and are liable for three times the "amount of the charge" that each borrower paid for the reimbursement and associated fees.

155.    As the ones who approved and directed such unlawful conduct, the Executives are also so liable.

. . .

. . .

156.    As explained above, because John Doe Investor Mortgagees do not qualify as "holder[s] in due course" under A.R.S. § 47-3302, they are liable in recoupment for this amount.

**Second Cause of Action**
**Violation of Real Estate Settlement Procedures Act—"Splitting Charges"**
**(12 U.S.C. § 2607(b))**
**(Against TLC, the Charities, the Executives, and John Doe Investor Mortgagees)**

157.    The preceding allegations are hereby incorporated by reference as if fully set forth herein.

158.    TLC "charge[d]" Plaintiff and the other Class Members for the gift/reimbursement settlement service by increasing their interest rate as compared to a non-gift loan. 12 U.S.C. § 2607(b).

159.    TLC then gave the Charities a "portion, split, or percentage" (*id.*) of this charge through the reimbursement to them (the reimbursement was a "portion" because it was less than the full amount of TLC's charge to the borrower).

160.    Such payment to the Charities was not "for services actually performed" (*id.*) because (i) the Charities promised and agreed their payment was a "gift" for which no compensation was due, and (ii) the gifting/reimbursement transaction was unlawful, made in bad faith, and with intent to defraud and deceive the borrower and HUD.

161.    As a result, TLC and the Charities violated 12 U.S.C. § 2607(b) and are liable for three time the "amount of the charge" that each borrower paid for the reimbursement and associated fees.

162.    As the ones who approved and directed such unlawful conduct, the Executives are also so liable.

163.    As explained above, because John Doe Investor Mortgagees do not qualify as "holder[s] in due course" under A.R.S. § 47-3302, they are liable in recoupment for this amount.

**Third Cause of Action**
**Violation of Racketeer Influenced and Corrupt Organization Act—**
**"Enterprise Liability"**
**(18 U.S.C. § 1962(c))**
**(Against TLC Executives and John Doe Investor Mortgagees)**

164.    The preceding allegations are hereby incorporated by reference as if fully set forth herein.

*Person*

165.    The "person[s]" are the TLC Executives, all of whom were "employed by" TLC. 18 U.S.C. §§ 1961(3) & 1962(c).

*Enterprise*

166.    The "enterprise" is TLC. 18 U.S.C. §§ 1961(4) & 1962(c).

167.    TLC is engaged in "interstate commerce" by operating in multiple states, using an out-of-state warehouse lender, making loans to out-of state borrowers, and selling its loans to out-of-state buyers, all of which "affect" interstate commerce. 18 U.S.C. § 1962(c).

168.    TLC existed separate and apart from the pattern of racketeering activity described below.  TLC existed before the initiation of such pattern and continues to exist today after the recent cessation of such pattern.  Also, during the period of such pattern, TLC conducted other lawful mortgage banking business besides the program.

*Pattern of Racketeering Activity*

169.    The TLC Executives conducted and participated in TLC's affairs through a pattern of racketeering activity.

170.    The predicate acts forming this pattern occurred within the past ten years.

. . .

. . .

. . .

171.    Such predicate acts were not isolated, unrelated events, but rather were actuated by the same or similar motives and purposes, directed towards achieving the same or similar goals and results, involving the same or mostly the same participants, and involving the same or similar methods of commission.

172.    Upon information and belief, the TLC Executives knowingly committed the predicate criminal acts of mail and wire fraud as to each "1% down" FHA loan. *See* 18 U.S.C. §§ 1341 & 1343.  This loan program, devised by the TLC executives, involved a scheme and artifice to defraud borrowers by obtaining their money through knowingly false and fraudulent pretenses and representations, to defraud HUD by obtaining loan insurance certificates through false and fraudulent representations and certifications, and to establish, maintain, preserve and profit from the program through knowingly false and fraudulent representations and certifications to HUD, as well as by knowingly misleading, intimidating and threatening those who sought to discover and reveal the true nature of the program.  TLC knowingly employed deceit, chicanery, and other dishonest methods in achieving these interlocking objectives.

173.    For the purpose of executing such scheme and artifice to defraud, upon information and belief, the TLC Executives knowingly engaged in at least the following instances of mail and wire fraud:

        (a)    At or about the time of closing for Plaintiff and the other Class Members' loans, knowingly falsely certifying to HUD by mail and/or electronically (*i.e.,* by wire) that (i) "this mortgage is eligible for HUD mortgage insurance," (ii) "[no] charge has been made to or paid by the borrower except as permitted under HUD regulations," and (iii) TLC "has not paid any kickbacks, fee or consideration of any type, directly or indirectly, to any party in connection with this

transaction except as permitted under HUD regulations and administrative instructions." HUD-92900-A form;

(b)   Each year knowingly falsely certifying electronically (*i.e.,* by wire) to HUD through its FHA Connection, an on-line access system to HUD's computer system, that TLC "conforms to all HUD regulations" and has "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title 1 Letters, policies, and terms of any agreements entered into with the Department";

(c)   Knowingly directing and facilitating the wiring of funds in and out of escrow for Plaintiff's loan in or about June 2010 and doing the same for the other Class Members' loans;

(d)   Knowingly wiring funds into FHR's account sometime in the summer of 2010 for the reimbursement associated with Plaintiff's loan and doing the same for the other Class Members' loans; and

(e)   Knowingly communicating with the Charities by mail and email (*i.e.*, by wire) for each loan.

174.   Upon information and belief, the TLC executives also engaged in the predicate act of money laundering in violation of 18 U.S.C. § 1952 for each loan by knowingly conducting a financial transaction which they knew involved the proceeds of an unlawful activity, specifically the sale of a loan to a secondary market buyer and payment of part of the proceeds to the charity, with the intent to promote the further carrying on of the program, and to conceal the source of such proceeds, and also to avoid certain transaction reporting requirements under federal law.

175.   Upon information and belief, the TLC Executives committed the predicate criminal act of transporting in aid of racketeering enterprises in violation of 18 U.S.C. §

1952 by knowingly using the mail and other facilities of interstate commerce with the

intent to distribute the proceeds of an unlawful activity, specifically money laundering in

violation of 18 U.S.C. § 1956 and engaging in monetary transactions in property derived

from specified unlawful activity in violation of 18 U.S.C. § 1957.

176.    Upon information and belief, the TLC Executives have and continue to

commit the predicate criminal act of retaliating against an informant in violation of 18

U.S.C. § 1513(e) by knowingly, and with an intent to retaliate, suing the former TLC

employee who sent the most recent "whistleblower" letter, thereby costing him money in

defense costs and interfering with his ability to obtain and keep employment and earn a

living in the mortgage banking industry, for him providing truthful information relating to

the commission or possible commission of a federal criminal offense to a law

enforcement officer, specifically a HUD employee authorized under law to engage in or

supervise the prevention, detection, investigation, or prosecution of FHA loan fraud, as

well as, upon information and belief, the U.S. Attorney for the District of Arizona.

*Injury*

177.    Such pattern of racketeering activity resulted in "injury . . . [to] property"

("property" includes money) of Plaintiff and the other Class Members by virtue of the

monetary loss they have and continue to suffer on a monthly basis as a result of their

increased mortgage payments.

178.    As explained above, John Doe Investor Mortgagees do not qualify as a

"holder in due course" under A.R.S. § 47-3302 and therefore are liable in recoupment for

such damages.

. . .

. . .

. . .

**Fourth Cause of Action**
**Violation of Racketeer Influenced and Corrupt Organization Act—"Conspiracy"**
**(18 U.S.C. § 1962(d))**
**(Against the Charities, Mr. Cluff, FAMC, Wells Fargo and John Doe Investor**
**Mortgagees)**

179.    The preceding allegations are hereby incorporated by reference as if fully set forth herein.

*Person*

180.    The "person[s]" are the Charities, Mr. Cluff, FAMC and Wells Fargo. 18 U.S.C. §§ 1961(3) & 1962(d).

*Conspiracy*

181.    Upon information and belief, FHR reached an agreement with TLC in or about late 2008 or early 2009, with full knowledge of the unlawful nature of the program, to provide the "gifts" in exchange for TLC's reimbursement thereof plus an administrative fee, as well as not to disclose the fact of the reimbursement to the borrower or HUD, to make false representations and certifications to HUD regarding the program and loans, and to otherwise help secret the true nature of the program.  Upon information and belief, FHR knew about and intended to facilitate and support the scheme.  Upon information and belief, such conspiracy terminated in or about mid to late 2010.  The object of the conspiracy was to establish, maintain, expand, and profit from the program for FHR and TLC's mutual benefit.

182.    Upon information and belief, AHP, PA and Mr. Cluff reached an agreement with TLC in or about 2010, with full knowledge of the unlawful nature of the program, to provide the "gifts" in exchange for TLC's reimbursement thereof plus an administrative fee, as well as not to disclose the fact of the reimbursement to the borrower or HUD, to make false representations and certifications to HUD regarding the program and loans, and to otherwise help secret the true nature of the program.  Upon information and belief,

AHP, PA and Mr. Cluff knew about and intended to facilitate and support the scheme. Upon information and belief, such conspiracy terminated in or about early 2012.  The object of the conspiracy was to maintain, expand and profit from the program for AHP, PA, Mr. Cluff and TLC's mutual benefit.

183.   Upon information and belief, FAMC reached a tacit understanding with TLC in or about mid to late 2010, after receiving a copy of the first "whistleblower" letter, with full knowledge of the unlawful nature of the program, that TLC would continue to originate the loans and FAMC to buy them, that neither would disclose the fact of TLC's reimbursement to the borrower or HUD, that each would continuing making false representations and certifications to HUD regarding them, and that they would both otherwise continue to act and operate as if such reimbursements were not being made.  Upon information and belief, FAMC knew about and intended to facilitate and support the scheme.  Upon information and belief, such conspiracy terminated in or about early 2012.   The object of the conspiracy was to maintain, expand and profit from the program for FAMC and TLC's mutual benefit.

184.   Upon information and belief, Wells Fargo reached a tacit understanding with TLC in or about mid to late 2010, after receiving a copy of the first "whistleblower" letter, with full knowledge of the unlawful nature of the program, that TLC would continue to originate the loans and Wells Fargo to buy them indirectly through FAMC, that none of them would disclose the fact of TLC's reimbursement to the borrower or HUD, that each would continuing making false representations and certifications to HUD regarding them, and that they would all otherwise continue to act and operate as if such reimbursements were not being made.  Upon information and belief, Wells Fargo knew about and intended to facilitate and support the scheme.  Upon information and belief, such conspiracy terminated in or about early 2012.   The object of the conspiracy was to maintain, expand, and profit from the program for Wells Fargo and TLC's mutual benefit.

*Overt Acts*

185.    Upon information and belief, the Charities and Mr. Cluff agreed to take and did take various overt acts in furtherance of the conspiracy, including *inter alia* making the "gifts," accepting payment therefore, providing false "gift letters," making false representations and certifications to HUD, actively concealing the true nature of the program from the borrower and HUD, and otherwise enabling and promoting the program.  Upon information and belief, the Charities and Mr. Cluff intended to facilitate and support the scheme through such overt acts.  Upon information and belief, for each loan, the Charities and Mr. Cluff committed the predicate acts of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by mailing and/or emailing a "gift letter" to TLC and the borrower shortly before closing and making false annual certifications to HUD that the charity was in compliance with all applicable gift rules and regulations by mail and/or electronically.  Upon information and belief, for each loan, the Charities and Mr. Cluff also engaged in the predicate act of money laundering in violation of 18 U.S.C. § 1952 by knowingly conducting a financial transaction which he and the Charities knew involved the proceeds of an unlawful activity with the intent to promote the further carrying on of the "1% down" FHA loan program, and to conceal the source of such proceeds, and also to avoid certain transaction reporting requirements under federal law.  Upon information and belief, the Charities and Mr. Cluff took such acts with knowledge they were part of a pattern of racketeering activity with TLC.

186.    Upon information and belief, FAMC agreed to take and did take various overt acts in furtherance of the conspiracy, including *inter alia* purchasing the loans and thereby creating a market for them to maintain and grow and profit from the "1% down" FHA loan program.  Upon information and belief, FAMC committed the predicate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by wiring its purchase money funds for the loans it bought shortly after the closing of such loans and making

false annual certifications to HUD that it was in compliance with all applicable rules and regulations by mail and/or electronically.  Upon information and belief, for each loan, FAMC also engaged in the predicate act of money laundering in violation of 18 U.S.C. § 1952 by knowingly conducting a financial transaction which it knew involved the proceeds of an unlawful activity with the intent to promote the further carrying on of the program, and to conceal the source of such proceeds, and also to avoid certain transaction reporting requirements under federal law.  Upon information and belief, FAMC took such acts with knowledge they were part of a pattern of racketeering activity with TLC.

187.    Upon information and belief, Wells Fargo agreed to take and did take various overt acts in furtherance of the conspiracy, including *inter alia* purchasing the loans and thereby creating a market for them to maintain and grow and profit from the "1% down" FHA loan program.  Upon information and belief, for each loan, Wells Fargo committed the predicate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by wiring its purchase money funds for the loans it bought and making false annual certifications to HUD that it was in compliance with all applicable rules and regulations by mail and/or electronically.  Upon information and belief, for each loan, Wells Fargo also engaged in the predicate act of money laundering in violation of 18 U.S.C. § 1952 for each loan by knowingly conducting a financial transaction which it knew involved the proceeds of an unlawful activity with the intent to promote the further carrying on of the program, and to conceal the source of such proceeds, and also to avoid certain transaction reporting requirements under federal law.  Upon information and belief, Wells Fargo took such acts with knowledge they were part of a pattern of racketeering activity with TLC.

*Injury*

188.    Plaintiff and the other Class Members were injured financially by reason of these acts by the Charities, FAMC and Wells Fargo in the form of the increased mortgage payments they have and continue to pay on a monthly basis.

189.    As explained above, John Doe Investor Mortgagees do not qualify as a "holder in due course" under A.R.S. § 47-3302 and therefore are liable in recoupment for such damages.

**Fifth Cause of Action**
**Violation of Arizona Consumer Fraud Act**
**(A.R.S. § 44-1522)**
**(Against TLC, the Charities, the Executives, and John Doe Investor Mortgagees)**

190.    The preceding allegations are hereby incorporated by reference as if fully set forth herein.

191.    The Arizona Consumer Fraud Act makes unlawful the use of any "deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise [which includes services] whether or not any person has in fact been misled . . . ." A.R.S. § 44-1522(A).

192.    Since initiating its "1% down" FHA loan program, TLC has aggressively marketed the unlawful program. *See, e.g.,* YouTube, The Lending Company 1 Down (a internet video advertisement espousing the benefits of the TLC's 1% down payment program) *available at* http://www.youtube.com/watch?v=AmbjR8JT3LI; David Wood's Website (advertising TLC's 1% down payment program) *available at* http://www.davidwwood.com/1percent.html; The Finance Guy's Website *available at* http://www.thefinanceguy.net/index.rad;  http://directlendingpros.com/?p=144, Matt Torres's Website *available at* http://onepercentdown.weebly.com/; the Hayes's Website *available at*  http://homeloanscompany.net/; and EXP's Website  *available at* http://thebrooksteamaz.com/2011/06/19/get-2-5-gift-funds-from-the-lending-company-on-a-fha-va-loan/.

193.   Since at least January 1, 2009 until recently, to market, originate and close loans under the program, TLC through its agents, employees and others acting on its behalf or at its direction, has employed deception, deceptive acts or practices, fraud, false pretenses, false promises, misrepresentations or concealment, suppression or omission of material fact with the intent that others rely on such concealment and/or suppression or omission in violation of A.R.S. § 44-1522(A).

194.   In particular, TLC and the Charities have employed highly standardized communications and advertisements in the electronic and print media, as well as provided loan related forms, documents and instructions (*e.g.*, the "gift letter"), which were likely to be understood by Plaintiff and the other Class Members to mean that a borrower could qualify for an FHA loan with only a 1% down payment by receiving a 2.5% "gift" from TLC's partnering charity.  Such communications and advertisements were also likely to be understood by Plaintiff and the other Class Members to mean that this was a lawful *bona fide* "gift" that the borrower had no obligation to repay and would not be charged for in any manner.

195.   Such express and implied representations and omissions were false.  The minimum down payment for an FHA loan was and remains 3.5% not 1%.  Although charitable gifts are a permissible source of funds for the down payment, the charity must not have a financial interest in the transaction or be reimbursed by anyone who does, both of which occurred here, such that the "gift" was *not* allowed.  Moreover, contrary to these representations, Plaintiff and the other Class Members were required to repay the unlawful "gift" through increased mortgage payments.  The program essentially financed the "gift" for the borrower through an unlicensed lender, specifically the Charities.

196.   Such express and implied representations and omissions were material.  A reasonable person would deem such information highly relevant to the decision whether to take out such a loan, as Plaintiff did here.

197.   TLC and the Charities knew these express and implied representations and omissions to be false.

198.    TLC and the Charities intended for Plaintiff and the other Class Members to act upon these express and implied representations and omissions by responding to the communications and advertisements and taking out the subject loans.

199.   Plaintiff and the other Class Members did not know about the reimbursement and associated fees, or the interest rate hike to fund them, because TLC and the Charities actively concealed such information from them.

200.   Plaintiff and the other Class Members relied on these false representations and omissions and were reasonable and justified in doing so under the circumstances.

201.   Plaintiff and the other Class Members suffered damages from these false representations and omissions by entering into the loan agreements and paying the increased mortgage payments.

202.   By this misconduct, TLC and the Charities, which knowingly and intentionally acted in concert at all times relevant hereto, violated A.R.S. § 44-1522(A).

203.   As the ones who approved and directed such misconduct, the Executives are personally liable for such violations.

204.   TLC, the Charities, and the Executives acted with an evil heart guided by an evil mind and are therefore liable for punitive damages under Arizona law.

205.   As explained above, John Doe Investor Mortgagees do not qualify as a "holder in due course" under A.R.S. § 47-3302 and therefore are liable in recoupment for such damages.

. . .

. . .

. . .

**Sixth Cause of Action**
**Fraudulent Misrepresentation and Omission**
**(Against TLC, the Charities, the Executives, FAMC, Wells Fargo, and John Doe**
**Investor Mortgagees)**

206.　The preceding allegations are hereby incorporated by reference as if fully set forth herein.

207.　The foregoing conduct also amounts to common law fraud by TLC and the Charities.

208.　As the ones who approved and directed such misconduct, the Executives are personally liable for such fraud.

209.　In addition to their other actions described above, FAMC and Wells Fargo aided and abetted TLC and the Charities in the commission of such fraud by *inter alia* creating and maintaining a robust secondary market for these illegally procured loans, without which the program would have quickly failed, and by providing a means for TLC and the Charities to launder the illegal proceeds of the program.

210.　TLC, the Charities, the Executives, FAMC and Wells Fargo acted with an evil heart guided by an evil mind and are therefore liable for punitive damages under Arizona law.

211.　As explained above, John Doe Investor Mortgagees do not qualify as a "holder in due course" under A.R.S. § 47-3302 and therefore are liable in recoupment for such damages.

**Seventh Cause of Action**
**Breach of Contract**
**(Against TLC and John Doe Investor Mortgagees)**

212.　The preceding allegations are hereby incorporated by reference as if fully set forth herein.

. . .

. . .

213.    An express or implied term of the loan agreement between TLC and Plaintiff and the other Class Members was that they would not have to repay the "gift" from the charity or otherwise be charged for it in any manner.

214.    TLC materially breached this term of the contract by so charging them through an increased interest rate.

215.    Plaintiff and the other Class Members suffered damage from this material breach.

216.    As explained above, John Doe Investor Mortgagees do not qualify as a "holder in due course" under A.R.S. § 47-3302 and therefore are liable in recoupment for such damages.

217.    This claim arises out of contract pursuant to A.R.S. § 12-341.01.

**Eighth Cause of Action**
**Declaratory and Injunctive Relief**
**(28 U.S.C. § 2201)**
**(Against John Doe Investor Mortgagees)**

218.    The preceding allegations are hereby incorporated by reference as if fully set forth herein.

219.    An actual case or controversy exists between Plaintiff and the Class Members and John Doe Investor Mortgagees regarding the enforceability of the subject loans and whether John Doe Investor Mortgagees are subject to claims in recoupment and/or the defense of illegality voiding the promissory notes and deeds of trust.

220.    Pursuant to 28 U.S.C. § 2201(a), Plaintiff and the Class are entitled to a declaration that, for the reasons explained above, John Doe Investor Mortgagees do not qualify as "holders in due course" under A.R.S. § 47-3302.

221.    They are further entitled to a declaration that, even if they do qualify as "holder[s] in due course" under A.R.S. § 47-3302, John Doe Investor Mortgagees remain subject to the defense of illegality pursuant to A.R.S. § 47-3305(A)(1)(b) and, given the

circumstances surrounding the origination of the loans, they are illegal and hence void, thereby invalidating the promissory notes and deeds of trust.

222.    Given these facts, Plaintiff and the Class are entitled to a permanent injunction barring John Doe Investor Mortgagees from collecting on the loans and exercising any rights under the deeds of trust.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants as follows:

A.    For certification of the Class;

B.    For an award of damages, including treble and punitive damages, in an amount to be determined at trial;

C.    For declaratory and injunctive relief as described above;

D.    For an award of its reasonable attorneys' fees;

E.    For an award of its costs, taxable and otherwise; and

F.    For such other and further relief as the Court deems just and equitable.

RESPECTFULLY SUBMITTED this 12th day of June, 2012.

RIDENOUR, HIENTON & LEWIS, P.L.L.C.


By  /s/Christopher A. LaVoy
Christopher A. LaVoy
201 North Central Avenue, Suite 3300
Phoenix, Arizona  85004-1052


ARBOLEDA BRECHNER, PLC


By  /s/Carlos Arboleda
Carlos Arboleda
4545 East Shea Boulevard
Phoenix, Arizona 85254

Attorneys for Plaintiff and the Class