**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Margaret Galas, a single woman, individually and on behalf of those similarly situated,<br><br>                    Plaintiff,<br><br>vs.<br><br>The Lending Company, Inc., et al.,<br><br>                    Defendants. | No. CV-12-01265-PHX-SMM<br><br><br>**MEMORANDUM OF DECISION<br>AND ORDER** |

Pending before the Court is Plaintiff Margaret Galas's ("Plaintiff") Motion for Class Certification and Appointment of Class Counsel. (Doc. 102.)  Defendants The Lending Company, Inc. ("TLC"), Mark A. Nickel, Jennifer Nickel, Dave J. Johnson, Lauri Serota-Johnson, RJ Reynolds and Family Housing Resources ("FHR") (collectively "Defendants") filed their Response to Plaintiff's Motion for Class Certification and Appointment of Class Counsel.  (Doc. 115.)  Thereafter, Plaintiff replied in support of her Motion. (Doc. 119.) After careful consideration of the arguments set forth by the parties, and after hearing oral argument in this matter (Doc. 123), the Court will deny class certification.

## BACKGROUND

*Facts*

TLC is in the business of providing mortgage lending services to consumers.  To properly understand and place in context TLC's mortgage loan program at issue, the following background information is set forth.  In a typical mortgage loan, the mortgagee

pays the lender the mortgage amount for the real estate, plus interest and closing or settlement costs. Generally, a mortgage loan involves not only the lender bank, but also a mortgage broker, hired by the mortgagee to assemble the entire mortgage loan package and have the mortgage transaction ready to close by a date certain. The mortgage loan package consists of a number of settlement services. See Schuetz v. Banc One Mortgage Corp., 292 F.3d 1004, 1007 (9th Cir. 2002) (summarizing settlement services provided by mortgage brokers such as processing loan application, fees for recording, title examinations, credit reports, surveys, appraisals, home inspection, etc.). At closing, the mortgagee directly pays its mortgage broker a traditional 1% mortgage loan origination fee for its services. See Bjustrom v. Trust One Mortgage Corp., 322 F.3d 1201, 1203-04 (9th Cir. 2003). As part of other closing costs, the lender, indirectly through the mortgagee, agrees to pay the mortgage broker for settlement services generally denominated as yield spread premium payments,[1] and for larger loans, service release premium payments.[2] Id.

Congress enacted the Real Estate Settlement Procedures Act ("RESPA") in 1974 to protect home buyers from inflated prices in the home purchasing process.[3] Schuetz, 292 F.3d

---

[1]A yield spread premium ("YSP") is a payment made by a lender to a mortgage broker in exchange for that broker's delivering a mortgage ready for closing that is at an interest rate above the par value loan being offered by the lender. See Bjustrom, 322 F.3d at 1204 (citing Schuetz, 292 F.3d at 1007. "The YSP is the difference between the par rate and the actual rate of the loan; this difference is paid to the broker as a form of bonus. A YSP is typically a certain percentage of the loan amount; therefore, the higher the loan is above par value, the higher the YSP paid the mortgage broker. By choosing among various lenders and interest rates, a broker may, in effect, control his fees and, in that fashion, compete with other brokers. For example, a loan of 8% and no points where the par rate is 7.50% will command a greater yield spread premium for the broker than a loan with a par rate of 7.75% and no points." Id. (further citation and quotation omitted).

[2]"A service release premium ("SRP") is a payment made by a lender to a mortgage broker that is based on the amount of the loan referred to the lender to service. A larger loan has more valuable servicing rights because the total interest paid by the borrower is greater." Bjustrom, 322 F.3d at 1204  (further citation omitted).

[3]Effective July 21, 2011, administration and enforcement of RESPA changed from the Department of Housing and Urban Development ("HUD") to the Consumer Financial

at 1008. Congress sought to increase the supply of information available to mortgage consumers about the cost of home loans in advance of settlement, and to eliminate abusive practices such as kickbacks, referral fees, and unearned fees. Id. RESPA requires lenders to provide borrowers with a statement identifying all settlement charges on a standardized form, commonly known as a HUD–1,[4] 12 U.S.C. § 2603. Id. Thus, the HUD-1 provides an accounting of the settlement charges already stated, the amount due from the consumer to the mortgage broker for loan origination fee, for YSP charges, and for any SRP charge.  In addition, mortgage consumers are provided with an information booklet prepared by HUD that counsels borrowers on how mortgage transactions work and how to recognize inflated charges. Id. at 1008-09.

In this case, TLC operated as both the lender and its own mortgage broker in relation to the mortgage consumer.  (Doc. 115 at 3.)  In order for a mortgage loan to qualify for Federal Housing Administration ("FHA") insurance, the mortgage consumer in addition to responsibility for settlement charges, must make a down payment to the lender of at least 3.5%.  See 12 U.S.C. § 1709(b)(9). In this case, TLC sought to enable borrowers to satisfy the down payment requirement without providing the full 3.5% by offering consumers a "1% down" program.  (Doc. 45 at 3.)  The program required borrowers to provide a 1% down payment, after which they would receive down payment assistance, a "gift" of the additional 2.5% from a non-profit charitable organization. (Id.)  TLC advised borrowers that the borrowers were not obligated to make any future payments to the non-profit charitable organization; they were only responsible for their mortgage payments.

In May 2010, Plaintiff applied for and in June 2010 obtained an FHA insured mortgage loan from TLC in the amount of $132,554 through its 1% down program.  (Doc. 35 at 22; Doc. 35-9 at 2.)  Plaintiff provided 1% of the down payment and received a "gift" of the additional 2.5%, or a total of $3,375, from the charitable organization FHR.  (Doc. 45

Protection Bureau ("CFPB").

[4]HUD is the government agency charged with FHA mortgage loan oversight.

1    at 3.)  Plaintiff alleges that TLC charged her a higher interest rate than she would have

2    obtained had she not participated in the 1% down program.  That interest rate, she claims,

3    was elevated so that her mortgage could be sold as a "premium" mortgage on the secondary

4    market; TLC then used the additional proceeds from the sale of her loan to repay the charity

5    for the 2.5% gift and TLC retained the rest of the proceeds as an "administrative fee." (Doc.

6    35 at 15-19.) Additionally, FMR gave TLC a tax donation receipt for the monies TLC paid

7    to FMR after TLC sold Plaintiff's loan on the secondary loan market.  Plaintiff alleges that

8    while she was promised a "gift," she and other 1% down borrowers were actually paying for

9    the "gift" through an inflated mortgage interest rate, and that Defendants misrepresented to

10   her the terms of her mortgage loan.  (Doc. 35 at 22-23.)

11            *Procedural History*

12            Plaintiff filed a class action complaint asking this Court to certify the following

13   nationwide class action, defined as: "all persons in the United States who applied for and

14   received an [FHA] loan through TLC's "1% down" FHA loan program from the start of the

15   program to the present." (Doc 35 at 25.)  Plaintiff seeks nationwide class action certification

16   based upon the following causes of action: Claims one and two assert violations of portions

17   of RESPA. 12 U.S.C. § 2607(a) & (b). Claims three and four allege conspiracy and enterprise

18   liability violations of the Racketeer Influence and Corrupt Organization Act ("RICO"). 18

19   U.S.C. § 1962(c) & (d).  Claim five alleges a violation of the Arizona Consumer Fraud Act

20   ("ACFA"), A.R.S. § 44-1522. Claim six alleges common law claims of fraudulent

21   misrepresentation and omission. (Id. at 28-43.)

22            Previously, Judge David Campbell dismissed Claim 7, Breach of Contract. (Doc. 91.)

23   Plaintiff no longer seeks class certification for Claim 8, Declaratory and Injunctive Relief.

24   (Doc. 102 at 4.)

25            Prior to oral argument, Plaintiff submitted an investigative report regarding TLC's 1%

26   down program, which was conducted by HUD on behalf of their FHA program.  The August

27   20, 2013 report found that TLC's gift programs did not comply with HUD requirements

28   because they contained unallowable gifts. (Doc. 121.)  As a result of home mortgage loans

1    under the 1% Down Program, HUD reported that the FHA insurance program sustained

2    losses and seeks indemnity from TLC for those losses.  (Id.)

3                                     **STANDARD OF REVIEW**

4         *Class Certification*

5         Class actions are governed by Fed. R. Civ. P. 23.  Rule 23 "give[s] the district court

6    broad discretion over certification of class actions[.]"  Stearns v. Ticketmaster Corp., 655

7    F.3d 1013, 1019 (9th Cir. 2011). Class certification is " 'an exception to the usual rule that

8    litigation is conducted by and on behalf of the individual named parties only.' " Comcast

9    Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (quoting Califano v. Yamasaki, 442 U.S.

10   682, 700–701 (1979)).  "In order to justify a departure from that rule, a class representative

11   must be part of the class and possess the same interest and suffer the same injury as the class

12   members."  See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2550 (2011).

13        Rule 23 does not set forth a mere pleading standard.  Id. at 2551.  According to Rule

14   23(a), the party seeking class certification must affirmatively set forth facts sufficient to

15   satisfy the following four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and

16   (4) adequacy of representation.  Fed. R. Civ. P. 23(a); see also Amchem Prods., Inc. v.

17   Windsor, 521 U.S. 591, 613 (1997). *Numerosity* requires a class "so numerous that joinder

18   of all members is impracticable." Fed. R. Civ. P. 23(a)(1). *Commonality* requires "questions

19   of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The purpose of the rigorous

20   commonality standard is to require that class members' claims depend upon a common

21   contention whose truth or falsity will resolve an issue that is central to the validity of each

22   one of the claims in one stroke.  See Dukes, 131 S. Ct. at 2551 (stating further that what

23   matters is not the raising of common questions but rather the capacity of a classwide

24   proceeding to generate common answers apt to drive the resolution of the litigation); see also

25   id. at 2552 (stating that "without some glue holding [the rationale for the alleged violation]

26   together, it will be impossible to say that examination of all the class members' claims for

27   relief will produce a common answer to the crucial question" of whether there was a

28   violation); Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp., 917 F.2d 1171, 1175 (9th

1    Cir. 1990) (stating that commonality ensures that claims of individual class members share

2    a common core of facts "sufficiently parallel to insure a vigorous and full presentation of all

3    claims for relief"). *Typicality* ensures that the "claims or defenses of the representative

4    parties are typical of the claims or defenses of the class" as a whole. Fed. R. Civ. P. 23(a)(3).

5    Finally, *adequacy of representation* is necessary to "fairly and adequately protect the

6    interests of the class." Fed. R. Civ. P. 23(a)(4).

7         In addition to meeting the conditions imposed by Rule 23(a), the party seeking class

8    certification must satisfy through evidentiary proof at least one of the provisions of Rule

9    23(b).  See Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013).  Here, Plaintiff moves

10   for class certification pursuant to Rule 23(b)(3), which requires that the Court find (1) that

11   "questions of law or fact common to class members predominate over any questions affecting

12   only individual members," and (2) that "a class action is superior to other available methods

13   for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

14        The *predominance* inquiry "tests whether proposed classes are sufficiently cohesive

15   to warrant adjudication by representation." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022

16   (9th Cir. 1998) (citation and internal quotation omitted). "This analysis presumes that the

17   existence of common issues of fact or law have been established pursuant to Rule 23(a)(2);

18   thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." Id.; see

19   also Comcast, 133 S. Ct. at 1432 (reiterating that "[i]f anything, Rule 23(b)(3)'s

20   predominance criterion is even more demanding that Rule 23(a)").  "In contrast to Rule

21   23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual

22   issues." Hanlon,  "When common questions present a significant aspect of the case and they

23   can be resolved for all members of the class in a single adjudication, there is clear

24   justification for handling the dispute on a representative rather than on an individual basis."

25   Id. However, under Comcast, it is the court's duty to take a close look at whether common

26   questions predominate over individual ones.  133 S. Ct. at 1432; see also In re Hydrogen

27   Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008) ("If proof of the essential

28   elements of the cause of action requires individual treatment, then class certification is

1  unsuitable"). The *superiority inquiry* "requires determination of whether the objectives of
2  the particular class action procedure will be achieved in the particular case." Id. at 1023.
3  "This determination necessarily involves a comparative evaluation of alternative mechanisms
4  of dispute resolution." Id.

5      Although a district court has broad discretion to certify a class, the court must
6  undertake a "rigorous analysis" to ensure that the prerequisites of Rule 23 have been satisfied
7  and that class certification is appropriate. See Dukes, 131 S. Ct. at 2551; Hanon v.
8  Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992). The rigorous analysis that must be
9  undertaken regarding class certification frequently involves overlap with the merits of the
10 plaintiff's underlying claim. See Gen. Tel. Co. of SW. v. Falcon, 457 U.S. 147, 160 (1982)
11 (stating that "the class determination generally involves considerations that are enmeshed in
12 the   factual   and   legal   issues   comprising   the   plaintiff's   cause   of   action.").

13     Plaintiff asks this Court to certify the following nationwide class action, defined as:
14 all persons in the United States who applied for and received an FHA loan through TLC's
15 "1% down" FHA loan program from the start of the program to the present. (See Doc. 35
16 at 25.) Plaintiff alleges that Defendants orchestrated a fraudulent loan scheme targeting low-
17 income, first-time home buyers. Defendants deny these allegations and contend that Plaintiff
18 cannot meet the requirements for class certification.

19                                    **DISCUSSION**

20     The Court evaluates the prerequisites for class action certification pursuant to Federal
21 Rule of Civil Procedure 23. As part and parcel of that Rule 23 discussion, the Court will first
22 consider Rule 23(a), the prerequisites for maintaining a class action. Plaintiff must
23 affirmatively demonstrate her compliance with Rule 23. If Rule 23(a)'s prerequisites are
24 satisfied, then the Court will analyze Plaintiff's showing under Rule 23(b), as to whether the
25 alleged violations are appropriate for class treatment.

26     Plaintiff alleges that Defendants orchestrated a fraudulent loan scheme that targeted
27 low-income, first-time home buyers. Defendants deny these allegations, but only challenge
28 whether Plaintiff met the requirements for Rule 23(a)(4) and Rule 23(b)(3). Regarding

1   Plaintiff's various causes of action, the parties focus their arguments and analysis on the Rule
2   23(b)(3) predominance aspect under the assumption that Plaintiff's certification motion
3   hinges on whether individual issues predominate this complaint.

4        The Court will summarily review Rule 23(a)(1) thru (a)(3) as Defendants have not
5   challenged these prerequisites, and then analyze Defendants' contentions regarding Rule
6   23(a)(4) and Rule 23(b)(3).

7   **I.      RULE 23(a)**

8        **A.    *Numerosity***

9        Plaintiff alleges that TLC's 1% Down Payment loan program resulted in
10  approximately 800 borrowers receiving mortgages from TLC, which is a sufficiently large
11  number to satisfy Rule 23(a)(1)'s numerosity requirement. (Doc. 102 at 7.) Defendants do
12  not contest the numerosity prerequisite.

13       The Court's focus regarding numerosity is whether joinder of all potential plaintiffs
14  would be impracticable. Rule 23(a)(1). Numerosity requires examination of the facts of each
15  case and does not impose any absolute limitation. Gen. Tel. Co. of the NW., Inc. v. EEOC,
16  446 U.S. 318, 330 (1980). While no absolute limits exist, the Supreme Court has suggested
17  that a class of 15 members is too small to meet the numerosity requirement.  Harik v. Cal.
18  Teachers Ass'n, 326 F.3d 1042, 1051 (9th Cir. 2003) (citing Gen. Tel., 446 U.S. at 330).
19  Similarly, 40 or more members has been found to satisfy the numerosity requirement.  See
20  Horton v. USAA Cas. Ins. Co., 266 F.R.D. 360, 365 (D. Ariz. 2009).

21       While the number of Plaintiffs is not the deciding factor for numerosity, courts have
22  generally held that large numbers of potential claimants is indicative of joinder being
23  impracticable. See Immigrant Assistance Project of L.A. Cnty. Fed'n of Labor v. I.N.S., 306
24  F.3d 842, 869 (9th Cir. 2002) (recognizing that courts have certified classes solely on the
25  basis of the number of class members, even where that number is less than 100). Here, the
26  Court finds that the number of potential class members would make joinder of plaintiffs
27  impracticable. Therefore, the Court finds that Plaintiff has satisfied the numerosity
28  prerequisite in this case.

1

### B. *Commonality*

2    Plaintiff moves for class certification on the following causes of action: (1) whether

3    Defendants' loan program is actionable under RESPA § 8(a) and (b); (2) conspiracy and

4    enterprise liability allegations under RICO; (3) consumer fraud under the ACFA; and (4)

5    common law fraudulent misrepresentation and/or omission. (Doc. 102 at 8.) Defendants do

6    not contest the commonality prerequisite.  (Doc. 115 at 7.)

7    Plaintiffs must show that their claims depend upon a common contention. <u>Dukes</u>, 131

8    S. Ct. at  2551 (finding that what matters is not the raising of common questions but rather

9    the capacity of a classwide proceeding to generate common answers apt to drive the

10   resolution of the litigation); <u>see also</u> <u>id.</u> at 2552 (stating that "without some glue holding [the

11   rationale for the alleged violation] together, it will be impossible to say that examination of

12   all the class members' claims for relief will produce a common answer to the crucial

13   question" of whether there was a violation). The requirement of a common contention,

14   moreover, "must be of such a nature that it is capable of classwide resolution — which means

15   that determination of its truth or falsity will resolve an issue that is central to the validity of

16   each of the claims in one stroke."  <u>Id.</u>

17   In support of commonality, Plaintiff alleges that a single loan scheme affected each

18   member of the class.  According to Plaintiff, Defendants' systematic policies are applied to

19   all borrowers and there are no specific circumstances unique to any single borrower. Plaintiff

20   alleges that Defendants' conduct is actionable under RESPA § 8(a) and (b), RICO, the

21   ACFA, and as common law misrepresentation and omission because TLC impermissibly

22   charged class members a high interest rate or "premium price," and used the excess monies

23   to directly or indirectly reimburse FHR and because TLC, in exchange for referring

24   borrowers, received kick-backs from FHR in the form of gift letters and tax donation

25   receipts.

26   As Defendants do not contest commonality, the Court finds that Plaintiff has stated

27   common questions of fact and law.

28   ///

1

## C.    *Typicality*

2      Plaintiff contends that the typicality requirement is satisfied in this case because

3  Plaintiff and other prospective class members' "claims are all based on the same highly

4  standardized loan program." (Doc. 102 at 9.) While Plaintiff concedes that the class

5  members' claims about the amount of "Gift Marketing Fee" will differ, Plaintiff contends

6  that the alleged misrepresentations and omissions that appear in her loan documents also

7  appear in the loan documents issued to other prospective class members; therefore, the

8  typicality requirement is satisfied in this case. (Id.) Again, Defendants do not dispute the

9  typicality prerequisite.

10      "The Ninth Circuit has noted that the commonality and typicality requirements of

11  Rule 23(a) tend to merge . . . ." Horton, 266 F.R.D. at 365 (quoting Hunt v. Check Recovery

12  Sys., Inc., 241 F.R.D. 505, 510-11 (N.D. Cal. 2007)). Because "[t]he test of typicality 'is

13  whether other members have the same or similar injury, whether the action is based on

14  conduct which is not unique to the named plaintiffs, and whether other class members have

15  been injured by the same course of conduct.'" Hanon, 976 F.2d at 508 (quoting Schwartz v.

16  Harp, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). Under Rule 23(a)(3)'s permissive standards,

17  a plaintiff's claims need not be substantially identical, but only "reasonably co-extensive with

18  those of absent class members." Hanlon 150 F.3d at 1020.

19      In this case, Plaintiff has satisfied the typicality requirement of Rule 23(a) because the

20  alleged injuries to the named Plaintiff is similar in nature to the alleged injuries to the class

21  as a whole, and arise from the same course of conduct on the part of Defendants. When the

22  injury allegedly suffered by the named Plaintiff and the rest of the class arise out of the same

23  policy or practice by Defendants, the claims are sufficiently "typical" of those of the rest of

24  the class. See Dukes v. Wal-Mart, Inc., 509 F.3d 1168, 1184 (9th Cir. 2007) *overruled on*

25  *other grounds*, 131 S. Ct. 2541 (2011). The principle behind typicality is that "a plaintiff with

26  typical claims will pursue his or her own self-interest in the litigation, and in so doing, will

27  advance the interests of the class members." 1 H. Newberg, Newberg on Class Actions §

28  3:13, at p. 325 (2d ed. 1985).

1    As Defendants do not contest typicality, the Court finds that Plaintiff has stated claims
2    that similar in nature to the alleged injuries to the class as a whole, and arise from the same
3    course of conduct on the part of Defendants; therefore, the Rule 23(a)(3) requirement is
4    satisfied.

5         **D.    *Adequacy***

6    Plaintiff claims that the adequacy requirement is satisfied in this case because (1)
7    Plaintiff has no conflict of interest with the proposed class; and (2) the proposed class will
8    be adequately represented by a qualified and competent counsel. (Doc. 102 at 10.)
9    Defendants, however, argue that Plaintiff is not an adequate representative of the class
10   because she has "extremely limited knowledge regarding her loan transaction" and had
11   minimal participation in the loan transaction. (Doc. 112 at 27.)  Instead, her ex-husband took
12   the lead and negotiated the loan with Defendants. (Id.) Defendants contend that Plaintiff was
13   absent during many of the home loan discussions and even when she was present, Plaintiff
14   failed to pay attention to the discussions. (Id. at 28.) In her reply, Plaintiff argued that she has
15   a "reasonable recollection" of events and therefore should not be disqualified as a class
16   representative. (Doc. 119 at 10.)

17   Additionally, Defendants claim that the adequacy requirement is not satisfied in this
18   case because Plaintiff's counsel is the driving force behind this lawsuit, and not Plaintiff.
19   (Doc. 112 at 28.) Defendants allege that Plaintiff's counsel approached Plaintiff regarding
20   the possibility of bringing this lawsuit and this approach to litigation "weighs towards a
21   finding of inadequate representative." (Id. at 29.) In her reply, Plaintiff states that she
22   contacted counsel about initiating litigation. (Doc. 119 at 11.)

23   Under Rule 23(a)(4), a plaintiff must demonstrate that she "will fairly and adequately
24   protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This adequacy requirement
25   "satisfies due process concerns" in that "absent class members must be afforded adequate
26   representation before entry of a judgment which binds them." Parra v. Bashas', Inc., 291
27   F.R.D. 360, 387 (D. Ariz. 2013) (quoting Hanlon, 150 F.3d at 1020). This requirement also
28   raises concerns about the competency of class counsel and conflicts of interest. Id.

1   "Adequate representation depends upon, among other factors, an absence of antagonism
2   between representatives and absentees, and a sharing of interest between representatives and
3   absentees."  Parra, 291 F.R.D. at 387; see also Ellis v. Costco Wholesale Corp., 657 F.3d
4   970, 985 (9th Cir. 2011). Consequently, "[t]o determine whether named plaintiffs will
5   adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs
6   and their counsel have any conflicts of interest with other class members and (2) will the
7   named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'"
8   Id. (quoting Ellis, 657 F.3d at 985).

9       In her deposition, Plaintiff states that her ex-husband was primarily responsible for
10  gathering all the details for the purchase of the Apache Junction home. (Doc. 112-1 at 18.)
11  Plaintiff's admits that her ex-husband did all the ground work for the loan, including
12  researching the various home loan options available in the market for first time home buyers.
13  (Doc. 112-1 at 25.) In fact, Plaintiff acknowledges that it was her ex-husband who identified
14  and recommended TLC and their 1% Down Payment loan program to Plaintiff. (Id.)

15      Subsequently, the Court finds that it was Plaintiff's ex-husband who took the lead on
16  the loan transaction and negotiated with TLC.  (Id.)  Plaintiff's ex-husband was the principal
17  contact for TLC on the home loan because Plaintiff admits that she was not a party to all the
18  discussions between TLC personnel and her ex-husband. (Doc. 112-1 at 26-27.) The fact that
19  neither TLC nor Plaintiff's ex-husband involved Plaintiff in some of the discussions
20  regarding the mortgage loan indicate that her opinion was not requisite. Further, during her
21  deposition, Plaintiff was unable to recall basic details regarding the loan, such as the interest
22  rate on the loan amount. (Doc. 112-1 at 27.) The Court finds that Plaintiff was also unaware
23  whether there were any negotiations with TLC regarding the final interest rate. (Id.) Plaintiff
24  was not hands-on with the loan dealing and her involvement in the transaction was incidental.

25      Furthermore, Plaintiff's deposition indicates that Plaintiff's counsel had to solicit most
26  of the facts of this case from Plaintiff's ex-husband instead of Plaintiff. (See Doc. 112-1 at
27  22.) When counsel called Plaintiff to seek details about her mortgage loan she handed over
28  the phone to her ex-husband who gave details of the loan and his interactions with TLC.

- 12 -

1   (Id.)  Thus, Plaintiff was not fully aware of all the details regarding the loan and preferred

2   that her husband discuss the matter with counsel.

3          Based on the foregoing, the Court finds that Plaintiff's lack of knowledge of facts

4   creates the likelihood of a conflict of interest with absent class members, creating problems

5   with her assuming the role of class representative.  The Court finds persuasive Siemer v.

6   Associates First Capital Corp., No. CV 97-281, 2001 WL 35948712, at *17 (D. Ariz. March

7   30, 2001) (Roll, J., adopting the Magistrate Judge's Report and Recommendation), a similar

8   case where the wife appeared not to have had direct involvement with the events underlying

9   the action, but relied on her husband's explanation of the events.  The court found that the

10  wife's lack of direct involvement made her an inadequate class representative because "[a]

11  class action judgment is subject to attack by absent members of the class on the ground that

12  their interests were not adequately represented."  Id. "To adequately represent, one would

13  assume the class representative has direct, active involvement in the underlying events that

14  are the basis of the action." Id.; see also, Burkhalter Travel Agency v. MacFarms Intern.,

15  Inc., 141 F.R.D. 144, 153-54 (N.D. Cal. 1991).  In this case, the Court similarly finds that

16  although Plaintiff signed the loan documents, she was not directly and actively involved in

17  the loan transaction. Instead, she relied on her ex-husbands expertise and judgment.

18  Therefore, Plaintiff will not be able to adequately represent the absent members of the class.

19         No matter how competent counsel is, only the class representative knows the facts and

20  circumstances surrounding their case. See id. Moreover, unlike in a securities fraud case

21  which is too complex for most investors and where counsel's understanding and knowledge

22  is indispensable, this case involves Plaintiff's personal and rather direct interaction with her

23  lender/mortgage broker, TLC. See id. Therefore, Plaintiff must demonstrate fundamental

24  involvement with the activities at issue in this case.  A class counsel may not act "on behalf

25  of an essentially unknowledgeable client" because it "would risk a denial of due process to

26  the absent class members." Burkhalter Travel Agency, 141 F.R.D. at 154. Therefore, even

27  assuming counsel's absolute competence, the Court finds that Plaintiff lacks sufficient

28  knowledge and connection with the underlying facts of the case to act as a class

1   representative.  Plaintiff has not satisfied the Rule 23(a)(4) prerequisite.

2   **II.     Rule 23(b)(3)**

3          *Predominance*

4                  **A.     *RESPA § 8(a) Claim***

5          Plaintiff alleges that TLC is in violation of RESPA § 8(a) because pursuant to its 1%

6   Down Payment loan program TLC referred borrowers to FHR in exchange for "[some]thing

7   of value", which consisted of gift letters. (Doc. 102 at 11 (citing 12 U.S.C. § 2607(a)).)

8   Plaintiff argues that the gift letters were kickbacks in that but for these gift letters from FHR,

9   TLC would not be able to close the loan and make profit on it. (Id.) Further, by designating

10  TLC's payment to FHR as a charitable donation, FHR enabled TLC to receive tax benefits.

11  (Id.) Therefore, the gift letters and tax donation receipts constitute a "thing of value" under

12  RESPA. (Id.) Plaintiff claims that questions of law related to Defendants' liability under

13  RESPA § 8(a) are common to every class member and the resolution of these legal questions

14  will decide every class member's claim. (Id. at 11.) Thus, predominance is satisfied. (Id.)

15  As to FHR, Plaintiff argues that it did not provide any settlement services, but even assuming

16  that it did, those settlement services were illegal. (Doc. 102 at 12.)

17         Defendants contend that the predominance requirement is not satisfied in this case

18  because individual issues will predominate and therefore class treatment is not appropriate.

19  (Doc. 115 at 7.)  RESPA § 8(c) permits payment of fees for facilities actually furnished or

20  services actually performed in the making of a loan. See 12 U.S.C. § 2607(c); Schuetz, 292

21  F.3d at 1005-06.  Defendants contend that the "premium pricing" they charged Plaintiff for

22  her mortgage loan is analogous to YSPs (Doc. 112 at 7), and the Ninth Circuit holds that a

23  determination of whether allegedly YSPs violate RESPA § 8(a) turns on whether the total

24  compensation received is reasonably related to the actual services provided, which cannot

25  be determined on a class-wide basis. Schuetz, 292 F.3d at 1014. Defendants also contend that

26  TLC provided numerous settlement services to the borrowers as it acted as both the mortgage

27  lender and its own mortgage broker.  TLC worked with FHR in relation to the 1% Down

28  Payment loan program, including working with its loan officers, sending relevant information

1   to FHR for processing the down payment gifts, marketing the loan program and funding the

2   borrower's loan. (Doc. 112 at 13.)

3         Similarly, Defendants contend that FHR performed significant work in processing and

4   marketing the down payment gifts, including reviewing each borrower's documents to

5   confirm each borrower's eligibility, keeping records of each down payment gift, drafting and

6   sending the gift letters, working with TLC to market the 1% Down Payment loan program

7   in order to educate home buyers about this loan option, consistently communicating with

8   TLC regarding these issues and providing down payment assistance. (Id. at 15.) Therefore,

9   the premium pricing was used to compensate TLC and FHR for settlement services actually

10  provided. (Doc. 112 at 12.) Defendants contend that individualized inquiry into the terms of

11  each of the loan transactions is necessary in order to determine whether the compensation

12  provided to TLC and FHR was reasonable in light of the services provided. In support,

13  Defendants cite to several cases from the Ninth Circuit and other jurisdictions which affirm

14  that premium pricing or YSP cases are not appropriate for class certification based on the

15  need to determine individually whether compensable services were provided by the mortgage

16  broker and whether the total compensation paid is reasonable in light of the circumstances

17  of each individual loan.

18        Finally, Defendants argue that under the 1% Down Payment loan program TLC and

19  FHR provided a range of services to the borrowers, such as processing the loans, educating

20  the borrowers about the program, etc. To account for the costs associated with these services,

21  TLC incorporated a marketing fee into the final interest rate of the loan. Defendants contend

22  that the amount of this marketing fee differed for every borrower based on the services

23  provided to such borrower and several other factors, such as, the borrower's credit, the

24  borrower's income, the borrower's debt-to-income ratio, the borrower's assets, negotiations

25  with the borrower, the loan officer's compensation, and whether closing costs were paid up

26  front.

27        The Court agrees with Defendants that the mortgage loan transactions at issue will

28  require an individualized analysis and individual issues will predominate the litigation.

Therefore, class treatment is not appropriate. RESPA § 8(a) prohibits fees for referral. It provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a). RESPA § 8(c) clarifies, however, that payments for actual services provided are not prohibited. It provides that:

> "Nothing in this section shall be construed as prohibiting . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed . . . ."

Id. § 2607(c)(2). Considering RESPA § 8 as a whole, it can "reasonably be construed as only prohibiting payments that are for nothing else than referral of business." Schuetz, 292 F.3d at 1013. "Yield spread premiums are not illegal per se . . . ." Schuetz, 292 F.3d at 1014. In determining the propriety of a YSP payment under RESPA § 8(a), the Court analyzes the following two-prong test: (1) "whether services were actually performed for the total compensation paid," and (2) "whether that compensation is reasonably related to the services provided." Id.[5] The Schuetz court found that "[t]his necessarily means that individual issues predominate, and that a class action is not superior." Id. The Schuetz court further found that analyzing the two-prong test required individualized inquiry into the services provided and the total compensation paid for those services; therefore it concluded that common questions of fact were lacking, and that individual issues predominated over common ones. Id. There have been a number of cases on the subject of YSPs and all have reached the same result as in Schuetz. See Bjustrom, 322 F.3d at 1207. "Other circuits have rung in, consistent with [the Ninth Circuit's] opinion in Schuetz." Id.; see Glover v. Std. Fed. Bank, 283 F.3d 953 (8th Cir 2002); Heimmermann v. First Union Mortg. Corp., 305 F.3d 1257 (11th Cir. 2002); cf. Krzalic v. Republic Title Co., 314 F.3d 875 (7th Cir. 2002); Haug v. Bank of Am., N.A., 317

---

[5]The two-part test was set forth in RESPA Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10080 (March 1, 1999), and adopted by the Ninth Circuit in Schuetz, 292 F.3d at 1014.

1   F.3d 832 (8th Cir. 2003); O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732 (5th

2   Cir. 2003).

3          The Court finds that the referring party, TLC, entered into a relationship with FHR,

4   in which services were exchanged above and beyond referrals. Therefore, the parallels

5   between this case and Schuetz persuade the Court to utilize HUD test adopted in Schuetz.

6   Schuetz, 292 F.3d at 2014.  However, the Court notes one difference between this case and

7   Schuetz. The "thing of value" involved in this case is gift letters and tax donation receipts

8   rather than mortgage broker payments evaluated in Schuetz.  The Court concludes that this

9   difference is immaterial. In this case, TLC allegedly charged borrowers a higher interest rate,

10  but this increased cost was to compensate FHR for services provided to the borrower. TLC's

11  alleged "premium pricing" fees are analogous to YSPs. YSPs are not illegal *per se*, therefore

12  whether the "premium pricing" amounts to a prohibited referral turns on whether or not FHR

13  provided any services to TLC and if yes, whether the YSPs paid by TLC to FHR reasonably

14  relate to the services provided. See Schuetz, 292 F.3d at 1014. These issues are too fact-

15  intensive to be resolved on a class-wide basis. See Bjustrom, 322 F.3d at 1207.  The Court

16  also finds persuasive Isara v. Cmty. Lending Inc., No. CV 99-00310, 2000 WL 33680237,

17  at * 5 (D. Hi. Jan. 20, 2000), in which the court denied certification of RESPA Section 8(a)

18  kickback claim, citing cases and concluding that "[t]he vast majority of district courts have

19  held that the two-part test articulated in the Policy Statement requires a fact-based inquiry

20  into the individual circumstances of each loan transaction."

21         As to Plaintiff's argument regarding illegality, whatever the validity of such claim,

22  the problem at the class certification stage is that the existence or the amount of the services

23  and the kickback generally requires an individual analysis of each loan transaction. The

24  Court will need to analyze whether there were any services provided by Defendants. If yes,

25  then the Court will need to analyze each borrower's case to compare the services provided

26  with the payment made. Therefore, the Court finds that individual issues predominate in this

27  case and the predominance requirement is not satisfied.

28  ///

1

**B.    *RESPA § 8(b) Claim***

2      Plaintiff claims that common questions predominate under RESPA § 8(b) because the

3   Court can decide liability by determining that (1) TLC paid FHR a portion of the alleged

4   "premium price" charged to the borrowers in the 1% Down Payment loan program; and (2)

5   FHR performed no lawful services to the borrowers. (Doc. 102 at 11-12.) Defendants argue

6   that the predominance requirement is not satisfied for this claim because individual questions

7   also dominate this issue. (Doc. 112 at 13.)

8      Defendants contend that the two-part <u>Schuetz</u> test should be applied to the allegations

9   of "premium pricing" under RESPA § 8(b) and since the two-part test requires a fact-based

10  inquiry into the individual circumstances of each loan transaction, class action treatment is

11  not appropriate in this case. (<u>Id.</u>)

12     Plaintiff replies arguing that TLC's payment to FHR was not "for services actually

13  performed" because, first, reimbursement to FHR is unlawful, and second, the payment was

14  not *bona fide* compensation given the underlying fraud. (Doc. 119 at 6.) Therefore, while

15  FHR did provide services to TLC, those services were unlawful and hence not compensable.

16  (<u>Id.</u>)

17     The Court agrees with Defendants that the mortgage loan transactions at issue will

18  require an individualized analysis and individual issues will predominate the litigation.

19  Therefore, class treatment is not appropriate.   RESPA § 8(b) prohibits fee splitting. It

20  provides:

21          No person shall give and no person shall accept any portion, split, or percentage of
            any charge made or received for the rendering of a real estate settlement service in
22          connection with a transaction involving a federally related mortgage loan other than
            for services actually performed.
23

24  12 U.S.C. § 2607(b).  "The language of Section 8(b) prohibits only the practice of giving or

25  accepting money where no service whatsoever is performed in exchange for that money."

26  <u>Martinez v. Wells Fargo Home Mortg., Inc.</u>, 598 F.3d 549, 553 (9th Cir. 2010). "By negative

27  implication, Section 8(b) cannot be read to prohibit charging fees, excessive or otherwise,

28  when those fees are for services that were actually performed." <u>Id.</u>

1    Here, Defendants claim that FHR and TLC performed significant work in processing

2    and marketing the loans under the 1% Down Payment loan program. Defendants claim that

3    FHR worked towards implementing and marketing the 1% Down Payment loan program and

4    that FHR reviewed each borrower's documents to confirm eligibility, kept records of each

5    down payment gift, drafted and sent gift letters, worked with TLC to educate home buyers

6    about the 1% Down Payment loan program and consistently communicated with TLC

7    regarding all these issues. Plaintiff, however, contends that no services were actually

8    performed by FHR because such services were illegal.

9    Plaintiff's allegation that FHR's gifts made in 2010 were in violation of HUD's

10   regulations is a conclusory statement. Whether FHR's gifts violate HUD regulations is a

11   merit-based question that cannot be determined at the class certification stage. Further, the

12   Court has to foremost determine whether FHR provided any services to the borrowers. If yes,

13   then the Court will need to analyze whether the total compensation paid to FHR was

14   reasonably related to the services performed. This will require an individual analysis of each

15   of the loan transactions. Therefore, liability under RESPA § 8(b) will turn on individualized

16   factors and cannot be determined on a class-wide basis.

17   **C.     RICO, Fraud and Arizona Consumer Fraud Act**

18   Plaintiff alleges that Defendants violated RICO, 18 U.S.C. § 1962(c) and (d). (Doc.

19   102 at 12.)  In support of her RICO claim, Plaintiff claims that Defendants Messrs. Nickel,

20   Johnson and Reynolds, TLC's owners, officers and managers, unlawfully conducted the

21   affairs of TLC, and that TLC's business "undisputably" affects interstate commerce. (Doc.

22   102 at 12-13.) Further, Plaintiff claims that by providing gift letters and tax donation receipts

23   FHR conspired with TLC in the 1% Down Payment Program.  (Id.)  Next, Plaintiff claims

24   that Defendants violated the ACFA and committed common law fraud by their

25   misrepresentations and omissions regarding the loan program. (Id. at 22.) On the issue of

26   proximate causation Plaintiff concedes that certification of her civil RICO, common law

27   fraud and ACFA claims all turn on this issue. (Id. at 12, 22.)

28   ///

1        *First Party Proximate Causation*

2           Plaintiff argues that proximate causation can be established on a class-wide basis

3    using common proof. (Doc. 102 at 13-14.) Plaintiff argues common proof due to the highly

4    standardized scheme to defraud where the alleged misrepresentations and omissions are

5    found in uniform documents distributed to every class member. (Id.) Based on those

6    documents, the class members believed that the down payment assistance from FHR was a

7    gift. Plaintiff argues that had the class members known about TLC's unlawful return

8    payment to FHR, they would not have proceeded with the unlawful loan because their

9    participation could subject them to penalties for loan fraud. (Id. at 13-19.)

10          Defendants reject Plaintiff's argument. (Doc. 115.) Regarding Plaintiff's first party

11   common proof argument, Defendants contend that establishing a causal link requires a

12   showing of *individual* reliance and thus an examination of each individual class member's

13   circumstances, knowledge and understanding of the terms of the transaction and motivations

14   for deciding to enter into the transaction. (Id. at 17.) Defendants argue that the class members

15   do not necessarily share the same motivation and that the decision to proceed with a home

16   loan is a personal decision based on multiple factors, such as economic viability, a close

17   friend's association with the bank that financed the loan, recommendations from friends or

18   family members, eligibility problems with other banks, closing costs required from other

19   mortgage brokers, increased settlement charges, and so on. (Id. at 18.) Due to such an

20   individualized inquiry into each loan transaction, Defendants argue that class treatment is

21   inappropriate. According to Defendants, the Court will need to analyze each class member's

22   understanding of the 1% down loan terms, each class member's motivation for deciding to

23   proceed with the 1% down loan, and each class member's actual injury, all of which will

24   vary significantly across the class.

25          Defendants further argue that the Court cannot assume that all class members, having

26   qualified for down payment assistance, would have refused to proceed with the loan had they

27   known that their loan included a marketing fee that may have increased their interest rate on

28   the order of 2/10 of one percent. (Id.) Defendants reject Plaintiff's argument that increasing

a YSP to account for marketing costs is illegal loan fraud.  (Id. at 20.)  On these bases, Defendants contends that the Court should find that class action certification is inappropriate.

The Court rejects Plaintiff's request that the Court infer or presume proximate causation because had the class members known about TLC's unlawful return of monies to FHR, they would not have proceeded with the unlawful loan because their participation could subject them to penalties for loan fraud.  Although Plaintiff argues that no class member would risk the possible penalties for "alleged" loan fraud, the key word is "alleged."  It is undisputed that Plaintiff Galas's loan closed in June 2010.  (Doc. 102-1 at 2-5.)  In June 2010, at the time that Plaintiff's loan closed, HUD's August 2013 report had not yet been issued. (See Doc. 121, according to HUD's report, the 1% loan program was in violation of FHA rules.)  As of June 2010, Plaintiff's argument relies on a conclusory legal allegation, not a fact that has been established.  Certainly, in June 2010, Defendants had a different view of their mortgage loan program, as their briefing reiterates, "Plaintiff's argument relies on the incorrect assumption that increasing a yield spread premium to account for marketing costs is illegal loan fraud." (Doc. 115 at 20.)  Therefore, as of the time at which the events of the class action complaint occurred, June 2010, the Court will not infer or presume or find as a fact that class members would not participate in the 1% loan program because it could subject them to penalties for loan fraud.  Rather, at the time of the subject loan transactions, Defendants would be entitled to offer evidence that an individual class member or members understood through discussions with TLC's loan officer or by their own independent review that the 1% down loan program generally resulted in an incrementally increased interest rate and still chose to continue with the transaction.

Causation has been identified as the heart of a civil RICO claim.  As the Ninth Circuit explained,

> Lumping claims together in a class action does not diminish or dilute this requirement. It is well settled that, to maintain a civil RICO claim predicated on mail fraud, a plaintiff must show that the defendants' alleged misconduct proximately caused the injury. . . . [plaintiff] must draw a causal link between the alleged fraud and the alleged harm.

Poulos v. Caesars World, Inc., 379 F.3d 654, 664 (9th Cir. 2004) (citing cases).  In Poulos,

1   plaintiffs had alleged that defendants misrepresented the nature of a video poker game that
2   simulated the shuffling of a random deck of cards when in fact the machines did not use
3   cards and did not operate in the manner of the traditional card game.  The <u>Poulos</u> court
4   explained that it was not enough for a plaintiff to say that "I played the game and I lost
5   money"; rather, in order to establish the causal link, the plaintiff had to show that she was
6   an ace player in the traditional poker game and was misled to play the video poker game
7   believing that they functioned similarly and offered the same odds of winning.  <u>Id.</u> at 665.
8   The <u>Poulos</u> court further commented that "gambling is not a context in which we can assume
9   that potential class members are always similarly situated."  <u>Id.</u>  The gamblers did not
10  necessarily share the same motivation. <u>Id.</u> Some engaged in gambling as a social activity,
11  some for entertainment. <u>Id.</u> Thus, in <u>Poulos</u>, the court held that in order to prove proximate
12  causation, an individualized showing of reliance predominated, and therefore class
13  certification was not appropriate under Rule 23(b)(3).  <u>Id.</u>

14          The Court agrees with Defendants that establishing a causal link in this case requires
15  a showing of *individual* reliance and an examination of each individual plaintiff's
16  circumstances, knowledge and understanding of the terms of the transaction and motivations
17  for deciding to enter into the transaction.  Thus, for the class members choosing to participate
18  in the 1% loan program, their reasons for choosing that program are necessarily individual
19  and not appropriate for class certification.  Certainly, some may have questioned Defendants
20  about the gift letters to ensure that monies were not improperly being given back to the
21  charity, and certainly, at that time, Defendants would have provided their own rationale for
22  the legality of the program.

23          Overall the motivation for each class member entering into the 1% loan transaction
24  was individual and such individual motivation would require the Court to evaluate each loan
25  transaction.  As the court stated in <u>Poulos</u>, the class members are not "one motivation fits
26  all."  <u>See</u> 379 F.3d at 665.  The Court finds that the decision to enter into the 1% home loan
27  program was a personal decision based on multiple factors, such as the class member's
28  economic viability, a close friend's association with the bank that financed the loan,

1    recommendations from friends or family members, eligibility problems with other banks,

2    increased closing costs required from other mortgage brokers, increased settlement charges.

3    A class member may have decided to proceed with the loan regardless of the increased costs

4    because they dreamed of owning a home or because they believed that increased costs

5    throughout the term of the mortgage was worth it given the program's lowering of their

6    upfront costs.  Individual proof regarding each class member's motivations for choosing the

7    1% down loan program is necessary.

8          Furthermore, the Court does not find that common proof, the common documents

9    comprising the 1% loan program submitted to the class members, necessarily means that

10   individual proof will not be necessary.  Certainly, individual class members may have

11   interpreted key terms in standardized documents differently, or that oral discussions

12   regarding the meaning of those standardized documents also took place. See Buford v. H&R

13   Block, Inc., 168 F.R.D. 340, 360 (S.D. Ga. 1996) (stating that "whether the advertising

14   scheme and use of the term 'Rapid Refund' induced any of these class members to believe

15   that this was simply a refund fee rather than a high interest loan is . . . a question that is

16   individual to each class member.  Additionally, the question of whether class members who

17   were fully informed of the loan arrangement would have still taken the loan remains an

18   individualized determination.").

19         In summary, the Court rejects Plaintiff's first party proximate causation argument. The

20   Court will not infer or presume proximate causation because had the class members known

21   about TLC's unlawful return of monies to FHR, they would not have proceeded with the

22   unlawful loan because their participation could subject them to penalties for loan fraud.

23   Rather, because individual inquiries regarding each class members reliance on the allegedly

24   fraudulent scheme would be necessary, individual issues would predominate over common

25   issues and class treatment is not appropriate on the civil RICO allegations, the common law

26   fraud allegations, and the ACFA allegations.

27        *Third Party Proximate Causation*

28         Alternatively, citing Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639 (2008),

1    Plaintiff argues that third-party reliance sufficiently establishes proximate causation without
2    individual issues predominating. (Doc. 102 at 19-20.)  Plaintiff relies on <u>Bridge</u> because it
3    permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though
4    it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation.
5    <u>Bridge</u>, 553 U.S. at 656 (citations omitted).  Plaintiff alleges that third-party reliance is
6    warranted for class members because HUD relied on TLC's fraudulent misrepresentations
7    that the class members' loans were compliant with its regulations, and based on those
8    misrepresentations TLC was able to sell class members' FHA loans on the secondary market
9    without objection from HUD, leading to the class members increased interest rate on the
10   loan. (Doc. 102 at 19-20.)

11          As to Plaintiff's third-party reliance argument, Defendants contend that in order to
12   prove proximate causation, <u>Bridge</u> still requires that Plaintiff prove that the alleged violation
13   led directly to Plaintiff's injuries, which she cannot establish.  (<u>Id.</u> at 21-23.)

14          The Court rejects Plaintiff's third-party argument.  Under <u>Bridge</u>, third-party reliance
15   can satisfy the causation requirement of RICO only if there is "some direct relation between
16   the injury asserted and the injurious conduct alleged." 553 U.S. at 654 (further citation and
17   quotation omitted). The Supreme Court characterized this "direct relation" requirement as
18   a "demand" warranting "particular emphasis."  <u>Id.</u>  In <u>Bridge</u>, there was no question but that
19   the third party relied on a false misrepresentation and that such misrepresentation was
20   directly related to the plaintiff's loss.  <u>Id.</u> at 658.

21          Here, during the time frame at issue, it is undisputed that TLC was a non-supervised
22   lender under HUD and was authorized to originate FHA insured loans without pre-approval.
23   (<u>See</u> Doc. 121 at 12.)  In fact, there was no evidentiary reliance by HUD, the alleged third-
24   party, regarding alleged misrepresentations for loans originated under TLC's 1% down loan
25   program that are the subject of Plaintiff's complaint.  Furthermore, Plaintiff cannot establish
26   that any alleged misrepresentation is directly related to a class member's actual injury.  The
27   sale of a class member's loan on the secondary market that allegedly increased a class
28   member's mortgage interest rate is not directly related to any alleged misrepresentation made

to HUD.  Finally, by arguing throughout their complaint and motion that the class members relied on Defendants' alleged misrepresentations and that it was this reliance that caused them to sustain damages, this is a first-party reliance case.  This is not a third-party case like <u>Bridge</u> where the plaintiffs made no allegation of reliance on defendants' misrepresentations that caused them damage; it was the third-party that relied on defendants' misrepresentation that caused the plaintiff's damages.

In summary regarding the predominance factor, the Court rejects Plaintiff's third-party proximate causation argument.  The Court finds that this is a first-party reliance case, and that because individual inquiries regarding each class member's reliance on the allegedly fraudulent scheme would be necessary, individual issues would predominate over common issues and class treatment is not appropriate on the civil RICO allegations, the common law fraud allegations, and the ACFA allegations.  Finally, because the Court has already found that individual issues will predominate over common issues, the Court need not reach Plaintiff's arguments regarding superiority of class-wide litigation or that damages could be established on a class-wide basis.

## CONCLUSION

Based on the foregoing, the Court finds that Plaintiff failed to establish the Rule 23(a)(4) prerequisite and further finds under Rule 23(b)(3) that questions of law or fact common to the class members will not predominate over fact questions affecting individual class members.  Rather, individual issues will predominate over common issues and therefore class treatment is not appropriate on any of Plaintiff's claims.

Accordingly,

**IT IS HEREBY ORDERED** denying Plaintiff's motion to certify class and appoint class counsel.  (Doc. 102.)

DATED this 14th day of August, 2014.

Stephen M. McNamee
Senior United States District Judge

- 25 -